*This opinion is subject to revision before final publication in the Pacific Reporter*

**2016 UT 13**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

M.J.,
*Petitioner*,

*v.*

BRUCE R. WISAN, Court-Appointed Special Fiduciary of the United Effort Plan Trust,
*Respondent*.

No. 20140189
Filed March 23, 2016

On Appeal of Interlocutory Order

Third District, Salt Lake
The Honorable Keith A. Kelly
No. 070916254

Attorneys:

Jeffery L. Shields, Michael D. Stanger, Salt Lake City, for petitioner

Alan W. Mortensen, Lance L. Milne, Michael A. Worel, Paul M. Simmons, Salt Lake City, for respondent

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, and JUSTICE HIMONAS joined.

JUSTICE JOHN A. PEARCE became a member of the Court on December 17, 2015, after oral argument in this matter, and accordingly did not participate.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 In this case we consider an interlocutory appeal from the denial of a defense motion for summary judgment. The claims at issue were asserted by M.J., an individual who allegedly was required to enter into an underage marriage with Allen Steed at the direction of Warren Jeffs. At the time, Jeffs was acting as the head of

the Fundamentalist Church of Jesus Christ of Latter-Day Saints and trustee of the United Effort Plan Trust ("UEP Trust" or the "Trust"). M.J. filed suit against Jeffs and against Bruce R. Wisan in his capacity as Special Fiduciary of the Trust, asserting tort claims and grounds for both direct and vicarious liability.

¶2 The Trust moved for summary judgment on several grounds. The district court denied the Trust's motions. We agreed to review that decision on interlocutory appeal because the Trust's motions raised a number of important legal questions on matters of first impression—as to the effect of our decision in *Snow, Christensen & Martineau v. Lindberg*, 2013 UT 15, 299 P.3d 1058; the impact of M.J.'s release of claims against Allen Steed; and the viability of her claims for vicarious liability under the doctrines of *respondeat superior* and "reverse" veil-piercing. We affirm in large part. We uphold the district court's decisions on all issues except its determination that the Trust is subject to liability on reverse veil-piercing grounds.

I

¶3 In 1942, the leaders of a fundamentalist religious movement called the "Priesthood Work" formed the UEP Trust.[1] *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 2, 238 P.3d 1054. The Trust's stated purpose was "charitable and philanthropic." *Id.* But membership in the Trust was conditioned upon "consecration" of real and certain other property to the Trust. *Id.* "For this fundamentalist group—predecessor to the Fundamentalist Church of Jesus Christ of Latter-Day Saints (the 'FLDS Church' or 'Church')—consecration was an act of faith whereby members deeded their property to the UEP Trust to be managed by Church leaders." *Id.* "Church leaders, who were also trustees, then used this property to minister to the needs of the members." *Id.*

¶4 "In 1986, some Trust property residents sued the UEP trustees for breach of fiduciary duty." *Id.* ¶ 3. In proceedings leading to a decision of this court, we held that the Trust was subject to suit on fiduciary duty claims by Trust beneficiaries because it was a private, and not a charitable, trust. *See Jeffs v. Stubbs*, 970 P.2d 1234, 1252 (Utah 1998). The basis for that decision was the determination that

---

[1] In light of the summary judgment posture of this case, the facts here are presented in the light most favorable to M.J. *See Johnson v. Hermes Assocs., Ltd.*, 2005 UT 82, ¶ 12, 128 P.3d 1151.

the UEP Trust was intended from its inception to benefit specified individuals—the Trust's founders. *Id.*

¶5 In response to that decision, Rulon Jeffs, the then-president of the FLDS Church and sole surviving founder of the 1942 Trust, executed an "Amended and Restated Declaration of Trust of the United Effort Plan." *Fundamentalist Church*, 2010 UT 51, ¶ 4. This 1999 restatement established a charitable trust. *Id.* It also provided that "in the event of termination of this Trust, whether by the Board of Trustees or by reason of law, the assets of the Trust Estate at that time shall become the property of the Corporation of the President of the [FLDS Church]." *Id.*

¶6 From 1998 to 2006 the Trust was operated for the express purpose of furthering the doctrines of the FLDS Church, including the practice of plural marriage involving underage girls. Throughout this period there was no clear delineation between the FLDS Church and the Trust. Funds were comingled between the two entities, and the President of the FLDS Church had "extraordinary powers" in administering the Trust, including the power to appoint or remove trustees at will.

¶7 In 2004 the Trust was subjected to suit in two separate tort actions, one involving allegations of child sex abuse and the other asserting a fraud claim. *Id.* ¶ 5. At some point during the course of this litigation the Trust terminated its counsel. *Id.* And when the Trust declined to appoint substitute counsel, and trustees failed to otherwise appear, the court appointed a special fiduciary to represent the interests of the Trust until new trustees could be appointed. *Id.* ¶ 6. Eventually, "[t]he district court asked the special fiduciary to prepare a memorandum identifying issues the court needed to address before appointing new trustees." *Id.* ¶ 7. And "the special fiduciary expressed concern in a memorandum filed with the district court that the Trust needed to be reformed if new trustees were to be appointed." *Id.*

¶8 In response, "the district court entered an order that concluded that the Trust could be reformed so that the special fiduciary could administer the Trust to meet the 'just wants and needs' of the beneficiaries according to neutral, nonreligious principles." *Id.* ¶ 8. Through further litigation—and without any participation by the FLDS Church or its leaders or trustees of the Trust, all of whom sat silent on the sidelines—the district court ultimately reformed the Trust under the doctrine of *cy pres. Id.*

¶9 In reforming the Trust the district court sought to preserve the Trust's "charitable intent" of protecting the interests of Trust

beneficiaries. Yet it also concluded that "it could reform the Trust by excising the purpose of advancing the religious doctrines and goals of the FLDS Church to the degree that any of these were illegal," including "polygamy, bigamy, [and] sexual activity between adults and minors." *Id*. ¶ 12 (alteration in original). Thus, the reformation of the Trust effectively "strip[ped] the FLDS Church president of several powers under the Trust" and "remove[d] any requirement that the president of the FLDS Church approve any Board action" on behalf of the Trust. *Id*. ¶ 15.

¶10 The district court has since retained jurisdiction over the administration of the reformed Trust. As Special Fiduciary, Wisan has instituted a process allowing Trust beneficiaries to petition the Trust for benefits.

¶11 Further litigation has continued, however. Years after the Trust modification was complete, a group of FLDS Church members filed a petition for extraordinary writ challenging the reformation on constitutional and other grounds. We rejected that petition on equitable laches grounds in our decision in *Fundamentalist Church*, 2010 UT 51. In so doing, we noted that Church leaders and members had consciously determined to sit silent during the course of reformation proceedings in the district court, and that numerous claimants had relied on the finality of the court's reformation. *Id*. ¶¶ 33–34. For those reasons we denied the Church members' petition without reaching its merits.

¶12 In 2013, we also resolved a further dispute involving the Trust. In *Snow, Christensen & Martineau v. Lindberg*, 2013 UT 15, ¶ 56, 299 P.3d 1058, we considered district court orders disqualifying the Trust's former counsel from representing an adverse party in subsequent litigation and requiring former counsel to provide privileged material to the Trust and to its then current counsel. In reversing those orders, a majority of this court concluded that the Trust was effectively a new entity—in the position of an asset purchaser—for purposes of the issues presented in the case. *Id*. ¶ 48.

¶13 That brings us to this case. It was filed by M.J., a former member of the FLDS Church and beneficiary of the UEP Trust. M.J. alleges that in 2001, when she was fourteen years old, she was forced to marry Allen Steed, her first cousin. The wedding was performed by Warren Jeffs, who at the time was acting president of both the FLDS Church and the Board of Trustees of the Trust.[2] M.J. and Steed

---

[2] At the time of M.J's marriage, Rulon Jeffs, the father of Warren Jeffs, was the President of the FLDS Church. Yet Rulon Jeffs had

(continued…)

resided on UEP Trust property provided by another one of the trustees. M.J. claims that Steed repeatedly sexually assaulted and raped her while she resided on this property. She requested a divorce from Steed on multiple occasions, but Jeffs refused to allow it. He also refused to let M.J. live on Trust property separately from her husband. M.J. also alleges that none of the other trustees objected or acted to stop the marriage.

¶14  M.J. filed this suit in 2007. She has asserted a variety of tort claims against both Warren Jeffs and the UEP Trust[3] and advances claims for both vicarious and direct liability against the Trust. She seeks to hold Jeffs responsible, and the trust vicariously liable, for intentional infliction of emotional distress, outrage, and negligence. She also asserts claims against the UEP Trust for negligence, as well as negligent hiring, appointment, retention, and supervision.

¶15 M.J. advances two theories of vicarious liability. She first claims that Jeffs and other trustees were acting "in furtherance of the trust administration and within the scope of their authority," and thus contends that the Trust should be liable under the doctrine of *respondeat superior*. Second, she asserts that the UEP Trust was Jeffs's "alter ego." And on that basis she asserts a right to "reverse veil-piercing"—an equitable remedy that would treat Trust assets as if they were Jeffs's personal assets.

¶16 M.J. has not asserted any claims against Steed. But her complaint alleges that he was acting "at the direction and under the control of Warren Jeffs and other UEP Trust trustees" as ecclesiastical leaders. Third Amended Complaint at 8. In response, the Trust asserts a cross-claim for indemnity. It has also filed a third-

---

diminished capacity at the time of the marriage as a result of a stroke, and had delegated much of his authority to his son. Warren Jeffs took over as both President of the FLDS Church and President of the Board of Trustees of the Trust upon his father's death in 2002.

[3] In addition to these claims, M.J. initially asserted a claim of conspiracy to commit battery and sexual abuse of a child against both Jeffs and the Trust. The conspiracy claim was dismissed, however, because the court concluded that a conspiracy was not possible between a trustee and the trust that he administers. M.J. also asserted a breach of fiduciary duty claim against Warren Jeffs, but that claim appears to have been dropped. Neither of these claims is before us on this appeal.

party complaint against Steed and a notice of intent to allocate fault to Steed and others.

¶17 Steed responded by asserting claims against M.J. for invasion of privacy, libel, and slander. Those claims prompted a settlement between M.J. and Steed. In the parties' settlement agreement, M.J. and Steed agreed to a mutual release of all claims "that exist or may exist" between them. But the agreement made no express reference to—or preservation of—any claims against other persons or entities.

¶18 The Trust filed a series of motions for summary judgment. All of those motions were denied. The Trust then filed a petition for review on interlocutory appeal, which we granted. Our review of the district court's summary judgment decisions is *de novo. See Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56.

II

¶19 The Trust has advanced four principal grounds for summary judgment in its favor: (a) our decision in *Snow, Christensen & Martineau v. Lindberg*, 2013 UT 15, 299 P.3d 1058, which the Trust views as establishing that the reformed Trust is a new entity, and thus not liable for the tortious acts of its predecessor; (b) the release entered into between M.J. and Steed, which the Trust interprets as foreclosing any claims against the Trust; (c) the elements of the doctrine of *respondeat superior*, which the Trust contends are not satisfied; and (d) the doctrine of "reverse" veil-piercing, which the Trust urges us to reject, at least as applied to the circumstances of this case.

¶20 We affirm the denial of summary judgment in large part. We reject each of the Trust's proposed grounds for summary judgment except the last one. On that issue we generally endorse the doctrine of reverse veil-piercing, but conclude that its elements cannot be satisfied in this case.

## A. The Effect of Our Decision in *Snow, Christensen*

¶21 The Trust's first proposed ground for summary judgment is our decision in *Snow, Christensen & Martineau v. Lindberg*, 2013 UT 15, 299 P.3d 1058. In that case the Trust moved to disqualify the law firm of Snow, Christensen & Martineau (SC&M) from representing an association of FLDS Church members in litigation against the Trust. *Id.* ¶ 15. In advancing that motion, the Trust asserted that SC&M had represented the Trust's predecessor—prior to its reformation—in earlier litigation. *Id.* And it sought to disqualify the firm under rule 1.9 of the Utah Rules of Professional Conduct. *Id.*

¶22 The Trust also served subpoenas on SC&M seeking documents related to the firm's prior representation of the UEP Trust. *Id.* ¶ 14. SC&M refused to comply, asserting that the documents were protected by the attorney-client privilege. *Id.*

¶23 The district court agreed with the Trust. It entered an order disqualifying the firm from representing the association of church members against the Trust. *Id.* ¶ 16. And it also rejected SC&M's right to claim the attorney-client privilege. *Id.* ¶ 14. The basis for both decisions was essentially the same—that the unreformed UEP Trust was effectively the same entity as the reformed Trust. On that basis the court held that SC&M was barred from representing clients in related litigation against a former client under rule 1.9. *Id.* ¶¶ 15-16. And it also concluded that the privilege as to documents in SC&M's hands belonged to the Trust, and thus that the firm had an obligation to turn over privileged documents to the Trust upon request. *Id.*

¶24 This court reversed on both counts. The majority concluded that the secular reformation of the Trust "so changed its purpose and identity that it is a different entity" for purposes of rule 1.9 and the attorney-client privilege. *Id.* ¶ 43. Specifically, the majority noted that the reformed Trust had a different beneficiary class from that of its predecessor—and in fact that the reformed Trust had been accused of being overtly hostile to the interests of the FLDS Church. *Id.* ¶¶ 46–47. And on that basis the majority declined to deem the reformed trust "a continuation for purposes of the attorney-client privilege." *Id.* ¶ 48. Instead it treated the two entities as if the reformed trust had merely purchased the assets of the pre-reformation trust. *Id.*

¶25 The Trust seeks to extend the majority's analysis in *Snow, Christensen* to cut off M.J.'s claims against it. And the Trust has a point under the logic of the majority's analysis. If the reformed Trust is in the position of an asset purchaser, it would not be liable for the actions of its predecessor.[4]

---

[4] *See Tabor v. Metal Ware Corp.*, 2007 UT 71, ¶¶ 7, 11, 168 P.3d 814 (explaining the general rule of successor nonliability modeled on the Restatement (Third) of Torts section 12 and refusing to adopt additional exceptions adopted in other jurisdictions).

¶26 Yet the question presented is not a pure matter of logic. It is a question of law—of the interpretation of our decision in *Snow, Christensen*. For reasons set forth below, we decline to extend that decision to its logical end.

¶27 The majority position in *Snow, Christensen* was rooted in unstable ground. Its asset transfer analogy was persuasively questioned by a two-justice dissent. *Id.* ¶ 64 (Durrant, J., dissenting, joined by Nehring, J.) (asserting that the majority's "asset-purchase metaphor does not account for the legal and practical ramifications arising from the fact that . . . the trust was modified, not terminated"). And the majority itself was unwilling to extend its position to its logical conclusion; it expressly limited its decision by stating that it did not "implicate[] the rights of the Reformed Trust's beneficiaries" or affect the "validity" of the reformation. *Id.* ¶ 24 n.3.

¶28 That limitation is appropriate—and necessary to protect the settled interests of the claimants to the Trust's assets. The Trust's reformation has been upheld by this court. *See Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 35, 238 P.3d 1054. In the *Fundamentalist Church* case we held that any challenge to the reformation by the FLDS Church was barred under the doctrine of laches. *Id.* ¶ 26. Our laches analysis, moreover, was based in large part on protecting the interests of those who relied on the reformation at a time when the FLDS Church openly declined to participate in litigation leading to the reformation. *Id.* ¶¶ 31–35. Since that time numerous claimants have asserted claims against the reformed Trust for activity or conduct predating the reformation. And the Trust itself has settled such claims in parallel reliance on our decision.

¶29 We see no basis—save the logic of the *Snow, Christensen* majority—for now cutting off the Trust's liability for acts that predated the reformation. M.J. is in a particularly strong position in terms of her reliance interest in pursuing claims against the Trust. She first filed her claim in this case *before* our decision in *Snow, Christensen*. And she should be entitled to pursue her claim despite the breadth of the language employed in that opinion. We so hold, limiting the *Snow, Christensen* opinion to its facts and declining to extend it any further.[5]

---

[5] Neither party has asked us to overrule our opinion in *Snow, Christensen*. And we stop short of so doing in the absence of any such request. But we do repudiate the analysis in the court's opinion in that case. And we limit *Snow, Christensen* to its facts—to SC&M's

(continued…)

B. The Effect of the Steed Release

¶30 The second proposed basis for summary judgment for the Trust is the written release that M.J. entered into with Allen Steed. The Trust notes that that release did not expressly reserve a claim against the Trust. And in the Trust's view, the failure to reserve such a claim effectively forecloses it as a matter of law.

¶31 The Utah Code includes two separate provisions addressed to the effect of a written release of liability on claims against other parties. The first is the Joint Obligations Act (JOA), Utah Code sections 15-4-1 to -7. That statute provides that an "obligee's release or discharge of one or more of several obligors, or of one or more of joint or of joint and several obligors, does not discharge co-obligors against whom the obligee in writing and as part of the same transaction as the release or discharge expressly reserves his rights." UTAH CODE § 15-4-4. This preserves the traditional common law rule. As described in our cases, it provides that unnamed joint obligors are released "from liability by the release of other joint obligors *unless* there is an express reservation in writing" of the injured party's claim. *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 10, 48 P.3d 941.

---

representation of members of the trust, and the Trust's request for privileged document at that time and in the context of that case.

In so doing, we reserve for another day the question whether the Trust may be entitled to privileged material of potential relevance to M.J.'s claims against it. The Trust raised this concern in its briefing and argument in this case. It questioned the wisdom and propriety of a legal regime under which the Trust stands in its predecessor's shoes for liability purposes but is deemed a different entity for purposes of the attorney-client privilege. We see the Trust's point. It would seem an unfair whipsaw to subject the Trust to liability for its predecessor's torts without also arming the Trust with material necessary to its defense. So if there is privileged material in possession of the Trust's former counsel of relevance to this litigation, the Trust may well be entitled to it—notwithstanding our decision in *Snow, Christensen*.

We leave that question for future litigation, however. If and when the Trust seeks privileged material in the hands of its former counsel of relevance to this litigation, the courts may then consider the question whether to grant the Trust access to it.

¶32 Yet that general rule has been overridden to a large degree by the terms of the Liability Reform Act (LRA), Utah Code sections 78B-5-817 to -823. That statute provides that a "release given by a person seeking recovery to one or more defendants does not discharge any other defendant unless the release so provides." UTAH CODE § 78B-5-822. Our cases have read that provision as prescribing a rule under which a release of one party does not release another unless the other party is identified in the release. *Peterson*, 2002 UT 42, ¶ 10. So the LRA reverses the presumption of the JOA. Under the JOA the default is that a release of one party extends to others (with an exception where the claim is expressly reserved), while under the LRA the default is that a release of one party does not extend to others (with an exception for parties mentioned or identified in the release).[6]

¶33 We have described the LRA as effecting a *pro tanto* repeal of the terms of the JOA. *Id.* ¶ 11. Yet the repeal is incomplete. The JOA still stands in effect to a limited degree. Its presumption applies in the limited circumstance of "vicariously liable parties." *Id.* Such parties are not covered by the LRA because its terms are limited to "[d]efendant[s]," defined as those "claimed to be liable because of fault to any person seeking recovery." UTAH CODE § 78B-5-817(1). And because "[f]ault," in turn, is defined as an "actionable breach of legal duty" or "act" or "omission proximately causing or contributing to injury or damages sustained by a person seeking recovery," *id.* § 78B-5-817(2), we have deemed the terms of the LRA not to extend to liability based purely on principles of vicarious liability. *See Nelson ex rel. Hirschfeld v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints*, 935 P.2d 512, 514 n.3 (Utah 1997); *Peterson*, 2002 UT 42, ¶ 11.

¶34 The Trust invokes the above in support of its motion to dismiss M.J.'s claims. It notes that M.J.'s release of claims against Steed failed to reserve any claims against the Trust. And because M.J.'s claims against the Trust implicate its liability for actions involving others (Jeffs and Steed), the Trust insists that its alleged liability is vicarious—and thus that it is the JOA, and not the LRA, that applies. Because the JOA requires a claim to be expressly reserved in order for it to be preserved, moreover, the Trust asserts

---

[6] *See Child v. Newsom*, 892 P.2d 9, 12 (Utah 1995) (explaining that under the LRA "a release must contain language either naming the defendant or identifying the defendant with some degree of specificity in order to discharge that defendant from liability").

that M.J.'s claims are foreclosed by the JOA given the lack of any such reservation in the release executed by M.J. and Steed.

¶35 We see the matter differently. The standard for invoking the JOA is more limited than that advanced by the Trust. Not every claim for liability that involves another tortfeasor is exempt from the LRA. Instead, the JOA applies only where the basis for a party's liability attaches regardless of any showing of fault. Conversely, the LRA applies when liability is based on fault—even if that fault is connected to or arises out of the conduct of another individual.

¶36 A *respondeat superior* claim escapes the coverage of the LRA because it does not depend on any showing of "fault" by the party subject to such liability. LRA fault is an "actionable breach of legal duty" or an "act" or "omission proximately causing or contributing to injury or damages sustained by a person seeking recovery." UTAH CODE § 78B-5-817(2). And *respondeat superior* liability involves no act, omission, or breach of a duty *by the defendant*. It involves only a relationship (between a principal and an agent) and an act or breach *by a third party* (of an agent within the scope of agency).[7]

¶37 The only fault that must be established to sustain *respondeat superior* liability is the fault of the primary tortfeasor—the agent. The principal's liability is not based on fault. This is pure pass-along liability—liability of a principal for the acts of an agent.

¶38 A principal's pass-along liability is governed by the JOA, not the LRA. So a principal's liability is effectively waived by a release of claims against the agent (unless the claims against the principal are expressly reserved). This makes sense because the agent's acts are the only thread connecting the principal to the plaintiff. Once that thread is severed (by a release), there is no longer any basis for the principal's liability (unless it is expressly reserved).

¶39 That does not hold for claims based on "fault" under the LRA. For claims involving independent acts, omissions, or breaches of duty, a waiver of claims against one defendant does not sever the thread of liability back to the other. Products liability is a good example. A retailer has an independent duty not to sell defective products. Such a retailer is accordingly liable for harm caused by the

---

[7] RESTATEMENT (THIRD) OF AGENCY § 2.04 cmt. b (AM. LAW INST. 2006) (noting that "respondeat superior is a basis upon which the legal consequences of one person's acts may be attributed to another person").

defective products that it sells even absent any negligence or breach on the part of the manufacturer of such a product (or by the retailer itself).[8] And for that reason it makes sense to conclude that a release of a claim against the manufacturer would not result in a waiver of a claim against the retailer (unless the retailer is mentioned or identified in the release). This is the LRA rule. UTAH CODE § 78B-5-822.

¶40 The claims at issue in *Nelson* and *Peterson* fell clearly into the JOA basket. *Nelson* involved a claim of liability for a church, under the doctrine of *respondeat superior*, for the tortious conduct of a church leader acting within the scope of his church responsibilities. 935 P.2d at 514. *Peterson* is similar. It also involved a claim of liability under the doctrine of *respondeat superior*. The court found that the JOA applied to a claim of liability of an employer for the tortious acts of an employee within the scope of his employment. 2002 UT 42, ¶ 11.

¶41 M.J.'s claims against the Trust, by contrast, appear to fall into the LRA basket—at least to some extent. The basis for the Trust's liability in this case is not just pass-along liability *for the acts of Steed* (the subject of the release). Instead M.J. has asserted claims against the Trust based on tortious activity or fault on the part of *Jeffs*. Such claims stand independent of any fault assigned to Steed. And to that extent a release of claims against Steed would not sever the thread of liability extending to the Trust through Jeffs. So long as there is a separate, independent thread of liability extending to the Trust through Jeffs, the release of liability running through Steed would not affect claims running through Jeffs.

¶42 This analysis suggests a nuance that may require further refinement on remand. The Trust has maintained that the thread of liability running from Steed to Jeffs is vicarious in nature. That may be true to the extent that M.J. attempts to hold Jeffs liable for his relationship with Steed rather than for independent wrongful conduct. To the extent the Trust would be on the hook for Jeffs's

---

[8] *See* RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 1 cmt. a (AM. LAW INST. 1998) ("Courts early began imposing liability without fault on product sellers for harm caused by such defects, holding a seller liable for harm caused by manufacturing defects even though all possible care had been exercised by the seller in the preparation and distribution of the product.").

pass-along liability for the acts of Steed, the JOA would apply and would extend M.J.'s release of Steed's liability to the Trust itself.[9]

¶43 Not all of M.J.'s claims against the Trust appear to fit this paradigm, however. M.J. seems to be alleging negligence or fault on Jeffs's part that is not based solely on his relationship with Steed. Thus, Jeffs is described in M.J.'s complaint as "command[ing], instruct[ing], and facilitat[ing]" Steed's illegal marriage and sexual assaults against M.J. Third Amended Complaint at 7. And M.J. asserts that Jeffs's exercise of "supreme and inseparable" ecclesiastical authority threatened M.J. with "loss of . . . home, famil[y] and support," *id.* at 9, an allegation that seems to identify a basis for M.J.'s claim for intentional infliction of emotional distress. These allegations seem to fit the LRA paradigm. To the extent the Trust's liability is not pass-along liability for the acts of Steed, but liability with an independent thread of fault running through Jeffs, the LRA would apply and M.J.'s release of Steed would not result in a waiver of claims as to the Trust.

¶44 We leave the application of these principles for further litigation on remand. It will be up to the district court to decide in the first instance, on further motions or at trial, whether and to what extent M.J.'s claims run independently through Jeffs (and are thus preserved under the LRA) or run vicariously through Steed (and are thus subject to waiver under the JOA).

### C. The Doctrine of *Respondeat Superior*

¶45 A third proposed basis for summary judgment for the Trust is a series of challenges to the imposition of vicarious liability under the doctrine of *respondeat superior*. On grounds described in detail below, the Trust contends that it should not be held vicariously liable for the tortious conduct of Warren Jeffs. The Trust's arguments implicate both common law and statutory principles of *respondeat superior*.

---

[9] This conclusion would not be obviated, as M.J. insists, by the fact that M.J. has not asserted independent claims against Steed. The JOA applies broadly to individuals "severally bound for the same performance." UTAH CODE § 15-4-1(4). And if someone is vicariously liable for the conduct of another, then that person is clearly "severally bound for the same performance." Thus, it is clear that any vicarious claims against the trust based on its vicarious liability for the actions of Steed would be waived, even if Steed was not an agent of the trust and even if M.J. never brought these claims.

¶46   At common law a trust had no vicarious liability for the acts of a trustee. Trusts were not seen as separate entities capable of entering into contracts or incurring liabilities. *See Ace Inv'rs, LLC v. Rubin*, 494 F. App'x 856, 859 (10th Cir. 2012). So persons injured by the trustee—by his individual or representative acts—had only a right of action against the trustee as an individual, and no claim against the trust.

¶47   This common law regime has been altered by statute in Utah. Under section 1010 of the Uniform Trust Code, a trust is liable for the trustee's acts performed "in the course of administering [the] trust." UTAH CODE § 75-7-1010(1). This standard is not defined by statute or in our cases. And the caselaw in other jurisdictions that have adopted the Uniform Trust Code is scant.[10]

¶48   Yet the terms of the statute, in context, are quite clear. *In the course of* is the traditional formulation of the standard for vicarious liability under the doctrine of *respondeat superior*. *See Clark v. Pangan*, 2000 UT 37, ¶ 21, 998 P.2d 268 (inquiring into whether tortious conduct occurred "during the course of" employment); *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1042 (Utah 1991) (noting that a past case had rejected *respondeat superior* liability on the ground that "the employee's actions were a substantial departure from the course of employment"). We accordingly interpret the Uniform Trust Act as incorporating the established standard of *respondeat superior* liability. *See Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (noting that a legal term that is transplanted into a statute "brings the old soil with it" (citation omitted)). Thus, under section 1010 of that act, a trust is liable for the acts of a trustee when the trustee was acting within the scope of his responsibility as a trustee.

¶49   That leaves the question whether the tortious conduct of Jeffs can sustain the Trust's liability under the doctrine of *respondeat superior*. The Trust advances two grounds for avoiding such liability: (1) that intentional acts in furtherance of sexual misconduct are not within the scope of a trustee's employment under the standard set forth in *Birkner v. Salt Lake County*, 771 P.2d 1053, 1057 (Utah 1989);

---

[10] The limited caselaw on this point focuses mostly on whether a trustee may be reimbursed for his services as a fiduciary. *See, e.g., Hastings v. PNC Bank, NA*, 54 A.3d 714, 727 (Md. 2012) (noting that "a trustee is generally entitled to indemnity for expenses incurred reasonably and properly in the course of administering a trust").

and (2) that equitable considerations—such as concern for Trust beneficiaries who in no way participated in or benefited from Jeffs's acts—preclude application of the doctrine of *respondeat superior* in this case. We reject both of these arguments for reasons explained below.

1

¶50 *Respondeat superior* is a doctrine of the common law of agency. The basic question presented under this doctrine is whether to treat the torts of an agent as the acts of the principal. The arguments in favor of extending such liability include fairness to injured parties and deterrence of tortious activity.

¶51 First, *respondeat superior* "reflects the likelihood that an employer will be more likely to satisfy a judgment" than an employee and is in a better position to "insure against liability encompassing the consequences of all employees' actions." RESTATEMENT (THIRD) OF AGENCY § 2.04 cmt. b (AM. LAW INST. 2006). Second, *respondeat superior* is also aimed at deterrence. It "creates an incentive for principals to choose employees and structure work within the organization so as to reduce the incidence of tortious conduct." *Id*. "This incentive may reduce the incidence of tortious conduct more effectively than doctrines that impose liability solely on an individual tortfeasor." *Id*.

¶52 Yet fairness considerations also help mark the law's limitations on such vicarious liability. When an agent's act occurs within "an independent course of conduct" not connected to the principal, he is not acting within the scope of employment. *Id*. § 7.07(2) (also indicating that "[a]n employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control"). And it would be unfair to subject the employer to liability for tortious activity occurring within such an "independent course of conduct."

¶53 The difficult question for the law in this field has been to define the line between a "course of conduct subject to the employer's control" and "an independent course of conduct" not connected to the principal. *Id*. An "independent course of conduct" is a matter so removed from the agent's duties that the law, in fairness, eliminates the principal's vicarious liability. Such a course of conduct is one that "represents a departure from, not an escalation of, conduct involved in performing assigned work or other conduct that an employer permits or controls." *Id*. § 7.07 cmt. b.

¶54 Our cases have identified three factors of relevance to this inquiry: (1) whether the agent's conduct is "of the general kind the [agent] is employed to perform"; (2) whether the agent is acting "within the hours of the [agent's] work and the ordinary spatial boundaries of the employment"; and (3) whether the agent's acts were "motivated, at least in part, by the purpose of serving the [principal's] interest." *Birkner*, 771 P.2d at 1057. In the *Birkner* case we held as a matter of law that a social worker's sexual interaction with a client he met through a "crisis line" maintained by Salt Lake County was not a matter within the course of his employment with the county. *Id.* at 1058. In so doing we concluded that the worker's sexual interactions with the client were "not the general kind of activity a therapist is hired to perform" and "arose from his own personal impulses, and not from an intention to further his employer's goals." *Id.* So although the "misconduct took place during, or in connection with, therapy sessions," we held that "reasonable minds could not disagree with the conclusion that the sexual contacts in th[e] case were not within the scope of [the therapist's] employment." *Id.* And we cited, in support of that holding, "rulings in other jurisdictions holding as a matter of law that the sexual misconduct of an employee is outside the scope of employment" for purposes of the doctrine of *respondeat superior*. *Id.*

¶55 Our *Birkner* decision was handed down more than twenty-five years ago. And the law in this area has evolved somewhat in the ensuing years. The Third Restatement, for example, notes that consideration of whether an agent is "situated on the employer's premises" or "continuously or exclusively engaged in performing assigned work" is incompatible with "the working circumstances of many managerial and professional employees and others whose work is not so readily cabined by temporal or spatial limitations." RESTATEMENT (THIRD) OF AGENCY § 7.07 cmt. b. Thus, under the Third Restatement, and in the caselaw of a number of states, spatial and time boundaries are no longer essential hallmarks of an agency relationship.[11] Instead, the law now recognizes that agents may "interact on an employer's behalf with third parties although the

---

[11] *See Md. Cas. Co. v. Huger*, 728 S.W.2d 574, 579 (Mo. Ct. App. 1987) ("Whether an act is within the 'scope of employment' or 'scope of duty' is not measured by the time or motive of the act . . . ."); *Childers v. Shasta Livestock Auction Yard, Inc.*, 235 Cal. Rptr. 641, 647 (Cal. Ct. App. 1987) (holding that *respondeat superior* liability may attach even when tortious conduct occurs "at times and locations remote from the ordinary workplace").

employee is neither situated on the employer's premises nor continuously or exclusively engaged in performing assigned work." *Id*.

¶56 A number of courts have also questioned the viability of the requirement that an agent's acts be motivated in some part by an intention to serve the principal's purposes.[12] The Third Restatement itself maintains this element. *See id*. § 7.07(2) ("An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer."). And its commentary asserts that "[m]ost cases apply" this standard. *Id*. § 7.07 cmt. b.

¶57 Yet the Third Restatement commentary also acknowledges "[a]lternative formulations" in the caselaw of other jurisdictions, under which courts "avoid the use of motive or intention to determine whether an employee's tortious conduct falls within the scope of employment" and adopt a different standard for identifying the "tie between the tortfeasor's employment and the tort." *Id*. One such standard is whether "the tort is a generally foreseeable consequence of the enterprise undertaken by the employer or is incident to it"—in other words, whether the agent's "conduct is not so unusual or startling that it seems unfair to include the loss resulting from it in the employer's business costs," or whether the "tort was 'engendered by the employment[]' or an 'outgrowth' of it." *Id*. Another considers "whether the employment furnished the specific impetus for a tort or increased the general risk that the tort would occur." *Id*. "These tests leave to the finder of fact the challenge of determining whether a tortfeasor's employment did more than create a happenstance opportunity to commit the tort." *Id*.

¶58 We are not called upon here to resolve all aspects of the tension between our *Birkner* decision and the ensuing caselaw developments in other jurisdictions. To resolve this case we need not choose, for example, between the purpose or motive test that the Third Restatement portrays as the majority view and the "alternative" formulations that it describes. That is because we find that the Trust's attempts to defeat its liability on summary judgment

---

[12] *See Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn. 1982) (asserting that it is "a rare situation where a wrongful act would actually further an employer's business," while concluding that parsing an employee's motivation is "unrealistic and artificial").

fail under any of the above formulations (for reasons described below).

¶59 We do openly endorse one particular aspect of the Third Restatement formulation of the doctrine of *respondeat superior*, however. Specifically, and contrary to our decision in *Birkner*, we hold that an agent need not be acting "within the hours of the employee's work and the ordinary spatial boundaries of the employment" in order to be acting within the course of his employment. *Birkner*, 771 P.2d at 1057. Instead, as noted in the Third Restatement, we acknowledge that in today's business world much work is performed for an employer away from a defined work space and outside of a limited work shift. And we accordingly reject the Trust's attempt to escape liability on the ground that Jeffs's acts as a trustee were not performed while he was on the Trust's clock or at a work space designated for his work for the Trust. Instead we hold that the key question is whether Jeffs was acting "within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." RESTATEMENT (THIRD) OF AGENCY § 7.07(2).[13]

¶60 We also reject the Trust's reliance on *Birkner* for the proposition that settled caselaw establishes "as a matter of law that the sexual misconduct of an employee is outside the scope of employment." *See Birkner*, 771 P.2d at 1058 (citing cases). Granted, there are many cases that so conclude—both before *Birkner* and after.[14] And some of those cases seem to turn principally on the ground that drove our *Birkner* decision—that an agent who commits a sexual assault is merely gratifying his own personal sexual desire and cannot be viewed as advancing, even in part, the purposes of his

---

[13] In so concluding we do not foreclose the circumstantial relevance of the time and place of the employee's tortious activity. We simply hold that proof that the agent was operating within the hours of the employee's work and the ordinary spatial boundaries of the employment is no longer a required element of the doctrine of *respondeat superior*.

[14] *See, e.g., J.H. ex rel. D.H. v. W. Valley City*, 840 P.2d 115, 122–23 (Utah 1992); *Jackson v. Righter*, 891 P.2d 1387, 1391 (Utah 1995); *D.D.Z. v. Molerway Freight Lines, Inc.,* 880 P.2d 1, 4–5 (Utah Ct. App. 1994); *Andrews v. United States*, 732 F.2d 366, 370 (4th Cir. 1984); *Cosgrove v. Lawrence*, 522 A.2d 483, 484–85 (N.J. Super. Ct. App. Div. 1987).

principal.[15] Yet some of the cases in this field (particularly more recent ones) go the other way;[16] and a number of decisions adopt the "alternative" approach noted in the Restatement (Third) of Agency—in adopting a standard that turns not on motive or purpose but on foreseeability,[17] or on whether the employee's acts were

---

[15] *See e.g., J.H. ex rel. D.H.*, 840 P.2d at 123 (Utah 1992) (noting that "[n]o record evidence exists that would lead reasonable minds to conclude that [the employee] was acting in the interest of [his employer] when he committed acts of molestation on plaintiff").

[16] *Lyon v. Carey*, 533 F.2d 649, 655 (D.C. Cir. 1976) ("It is, then, a question of fact for the trier of fact, rather than a question of law for the court, whether the assault stemmed from purely and solely personal sources or arose out of the conduct of the employer's business . . . ."); *Stropes ex rel. Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 249 (Ind. 1989) ("A blanket rule holding all sexual attacks outside the scope of employment as a matter of law because they satisfy the perpetrators' personal desires would draw an unprincipled distinction between such assaults and other types of crimes . . . ."). *See also infra*, notes 17-18.

[17] *See Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn. 1983) ("[S]exual relations between a psychologist and a patient is a well-known hazard and thus, to a degree, foreseeable and a risk of employment."); *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 364 (Cal. 1995) (concluding that a sexual tort is "engendered by the employment" if the "motivating emotions were fairly attributable to work-related events or conditions"); *Rodgers v. Kemper Constr. Co.*, 50 Cal. App. 3d 608, 619 (Cal. Ct. App. 1975) (concluding that liability attaches if "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business"); *Riviello v. Waldron*, 391 N.E.2d 1278, 1282 (N.Y. 1979) (concluding that "it suffices that the tortious conduct be a natural incident of the employment"); *Costner v. Adams*, 121 S.W.3d 164, 169 (Ark. Ct. App. 2003) (holding that "liability attaches when an employee commits a foreseeable act within the scope of his employment at the time of the incident").

engendered by or an outgrowth of the employment, or the employment furnished the impetus for the tort.[18]

¶61  With this in mind, we cannot accept the Trust's invitation to rule as a matter of law that the sexual activity of an agent can never be a matter within the scope of employment. That proposition may have seemed viable at the time of our decision in *Birkner*. But it seems less so now. In at least some circumstances the contrary conclusion is possible.

¶62  And we conclude that this is one of those cases. Given Jeffs's unique role as leader of the FLDS Church, and in light of the unusual, troubling function of plural marriage involving young brides in the FLDS culture, we hold that a reasonable factfinder could conclude that Jeffs was acting within the scope of his role as a trustee in directing Steed to engage in sexual activity with M.J. We affirm the denial of the Trust's summary judgment motion on that basis.

¶63  We do so, moreover, without directly resolving the tension between our decision in *Birkner* and the alternative formulations noted in the Third Restatement regarding the role of purpose or motive in the course of employment inquiry. Instead we hold that Jeffs's activity appears to fit under any of the standards employed by the courts, and thus that the Trust is not entitled to summary judgment on this ground.

¶64  In this case it cannot be said that Jeffs's acts were an "independent course of conduct" not intended by Jeffs to serve "any purpose" of the Trust. Jeffs's direction of the "marriage" between M.J. and Steed would certainly appear to be misguided. And Jeffs may have had his personal interest in mind when he exercised control over trust property to compel M.J. to be submissive to his ecclesiastical authority and remain in her illegal marriage. But in these unusual circumstances we cannot conclude that Jeffs had no

---

[18] *Simmons v. United States*, 805 F.2d 1363, 1369, 1371 (9th Cir. 1986) (concluding that a counselor who exploited patient's "trusting dependency relationship" in order to induce sexual conduct acted "in conjunction with his legitimate counseling activities"); *Xue Lu v. Powell*, 621 F.3d 944, 954 (9th Cir. 2010) (considering whether a sexual assault was "an outgrowth of workplace responsibilities, conditions or events" (citation omitted)).

purpose of advancing the interests of the Trust (however misguided those interests may seem—as they certainly do).

¶65 As trustee of the Trust prior to its reformation, Jeffs was called upon to administer the Trust in accordance with the doctrines and principles of the FLDS Church. Those doctrines and principles, according to M.J.'s allegations and evidence in the record, included the arrangement of plural, underage marriages. Thus, as abhorrent and troubling as this may appear to be, there is a basis in the record for the conclusion that Jeffs's acts were aimed in part at advancing the interests of the Trust as he perceived them. And there is also reason to conclude that Jeffs's conduct was "of the general kind" he was expected "to perform" as trustee. We affirm the denial of the Trust's motion for summary judgment on that basis.

¶66 In so doing, we leave open the possibility in a future case of reviewing and revising the standard set forth in our decision in *Birkner*. We see no need to do so here because the Trust's motion fails even under the *Birkner* standard. But we also note that the "alternative" formulations set forth above would also be met in this case. And although we need not reach the question here, we leave open the possibility of embracing one of these alternative standards in a future case in which the question is presented.

2

¶67 The doctrine of *respondeat superior* is rooted in common law principles of agency. As noted above, it is aimed at assuring adequate deterrents against tortious activity by agents. And because principals are often more likely to have resources (or insurance) sufficient to pay compensation, *respondeat superior* liability also protects the interests of injured parties in being compensated.

¶68 These premises of the doctrine of *respondeat superior* are a threshold ground for rejecting the Trust's equitable challenge to its application here. Our law has long held that equity is served by recognition of a principal's vicarious liability for the acts of an agent falling within the scope of his employment. The common law, moreover, has left no room for case-by-case evaluation of the equities of imposing such liability in light of the nature of the principal's business or the innocence of its stakeholders. It has concluded instead that equity is enhanced by the extension of vicarious liability in the broad run of cases. So the innocence of the Trust's beneficiaries is no reason to foreclose its vicarious liability under the doctrine of *respondeat superior*. That doctrine presupposes an innocent principal. Yet it extends vicarious liability on the basis of

a determination that the upsides of such liability outweigh any downsides.

¶69 The Trust's equitable challenge to the doctrine of *respondeat superior* is undermined further by the terms of the Uniform Trust Act. Under that statute an injured party has a cause of action against a trust for actions of a trustee "in the course of administering a trust." UTAH CODE § 75-7-1010(2). That provision leaves no room for us to second-guess the imposition of vicarious liability on a trust for the acts of a trustee. Where the legislature has spoken our role is limited. In the face of duly-enacted legislation we no longer have a primary policymaking role. *See Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 70, 345 P.3d 619 (noting that in light of "a detailed statutory scheme . . . our role as policymaker is preempted"). We are left only to interpret the terms of the statute and then to implement them.

¶70 That conclusion forecloses the Trust's equitable position. The Uniform Trust Act draws no distinctions between different types of trusts. And it leaves no room for an exception to *respondeat superior* liability for trusts whose beneficiaries are innocent victims of a trustee's tortious acts. That may often be the case where a trustee engages in tortious activity. But if that activity falls within the scope of the trustee's responsibilities in administering the trust, the trust is vicariously liable by statute—whether or not a court might find such liability equitable.

### D. Reverse Veil-Piercing

¶71 The Trust's final proposed basis for summary judgment is addressed to a different theory of vicarious liability asserted by M.J.—"reverse piercing" of the corporate veil, under which an artificial entity may be viewed as an individual's alter ego, and the entity is thus deemed responsible for the individual's personal acts. This court has not had occasion to endorse this theory of liability in its past cases. And the Trust urges us to reject it as a matter of law. Alternatively, it also urges us to refuse to extend this doctrine to the circumstances of this case.

¶72 For reasons noted below we acknowledge the viability of the doctrine of reverse piercing of the corporate veil under Utah law. Yet we also conclude that extension of this doctrine in this case would be improper, and thus foreclose its application on remand.

1

¶73 Corporations and certain other artificial entities are treated as legally distinct from their shareholders, officers, and directors. As a general rule they are accordingly shielded from liability; they have no individual responsibility for the legal obligations of the corporate

entity. *See Dockstader v. Walker*, 510 P.2d 526, 528 (Utah 1973). This is the concept of the corporate veil.

¶74 We have long embraced an exception to this general rule, however. Where a shareholder, officer, or director abuses the corporate form, and treats the legal entity as his alter ego, our law allows a creditor to pierce the veil. *Id.* Veil-piercing allows claimants to go after the assets of an individual in the unusual circumstance in which the corporate entity is not really distinct from the individual. *Id.* This principle has also been extended to the trust context.[19]

¶75 Our law counsels "great caution" before allowing a claimant to pierce the corporate veil. *Shaw v. Bailey-McCune Co.*, 355 P.2d 321, 322 (Utah 1960). Most often, the cases in which the veil is appropriately pierced involve a limited number of shareholders or trustees, or at least an unusual unity of interest and purpose. *Dockstader*, 510 P.2d at 528 (noting that the "doctrine is generally applied to . . . 'one-man corporations'"). We have also said that the corporate veil may be pierced only in circumstances where refusing to do so "would sanction a fraud or promote injustice." *Grover v. Garn*, 464 P.2d 598, 603 (Utah 1970) (citation omitted).[20] And because veil-piercing is an equitable remedy it is available only where it is "in the interest of justice," *Shaw*, 355 P.2d at 322, a standard that takes into account the availability of an "adequate remedy at law" to prevent irreparable harm to the plaintiff, *Buckner v. Kennard*, 2004 UT 78, ¶ 56, 99 P.3d 842, and the potential for adverse impacts on third parties, *see Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1577 (10th Cir. 1990).

¶76 Reverse piercing cuts the opposite way. It allows a claimant to access the assets of a corporate entity (or other entity like a trust) for the acts of an individual—and to do so in circumstances where the individual and the entity were not treated as distinct, but have

---

[19] *See e.g., In re Maghazeh*, 310 B.R. 5, 16 (Bankr. E.D.N.Y. 2004); *In re Felice*, 494 B.R. 160, 175 (Bankr. D. Mass. 2013).

[20] We have endorsed the factors set forth in *Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987), as "non-exclusive considerations" for deciding whether a corporation is an alter ego. *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 21, 284 P.3d 630. Many of these factors—like the failure to observe formalities, pay out expected sums, or maintain adequate records—may also be useful in the trust context. Yet we reiterate that these are "merely helpful tools and not required elements." *Id.* ¶ 18.

become each other's alter ego. *See generally* Kurtis A. Kemper, Annotation, *Acceptance and Application of Reverse Veil-Piercing — Third-Party Claimant*, 2 A.L.R.6th 195 (2016). Courts in other jurisdictions have long embraced this theory of reverse veil-piercing.[21] In Utah we have not yet had occasion to do so. In past cases we have twice been asked to endorse the principle of reverse piercing of the corporate veil. But both times we demurred, resolving the case instead on other grounds. *See Messick v. PHD Trucking Serv., Inc.*, 678 P.2d 791, 793 (Utah 1984); *Transamerica Cash Reserve, Inc., v. Dixie Power & Water, Inc.*, 789 P.2d 24, 26-27 (Utah 1990).

¶77 In this case the viability of reverse veil-piercing is squarely presented. And we take this occasion to generally endorse this principle of liability. In years past we could properly say that reverse piercing was "a little-recognized theory." *Messick*, 678 P.2d at 793. But that is no longer a correct description of the law in other jurisdictions. This principle of liability has now gained widespread acceptance. *See* Kurtis A. Kemper, Annotation, *Acceptance and Application of Reverse Veil-Piercing — Third Party Claimant*, 2 A.L.R.6th 195 § 4 (2016) (listing eighteen states, D.C., and a number of federal courts that have accepted reverse veil-piercing). Even in Utah, our courts appear to have employed it without great controversy or difficulty. *See Colman v. Colman*, 743 P.2d 782, 786-87 (Utah Ct. App. 1987).

¶78 More importantly, the doctrine of reverse piercing seems to us to "follow[] logically" from the premises of the longstanding doctrine of traditional (direct) veil-piercing. *Transamerica Cash Reserve, Inc.*, 789 P.2d at 26 (Utah 1990). Where an individual so abuses the corporate form that it becomes his alter ego, and where honoring its separate existence "would sanction a fraud or promote injustice," *Grover*, 464 P.2d at 603 (citation omitted), it would make no sense for the law to preclude a claimant from treating the two as if they were identical. This is true not only for corporations, but also

---

[21] *See Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929) (Hand, J.) (acknowledging that in some limited cases "a subsidiary [might] . . . be liable for a transaction done in the name of a parent," while concluding that such circumstances, "if possible at all, must be extremely rare"); *W. G. Platts, Inc. v. Platts*, 298 P.2d 1107, 1110 (1956) (disregarding the corporate veil when a husband hid assets in a divorce).

for trusts.[22] And in such circumstances we conclude that our law should allow reverse piercing of the corporate veil.

2

¶79 The legal standards for reverse piercing, however, should be parallel to the law of direct piercing. Thus, following the principles set forth above, a claimant seeking to impose reverse-piercing liability on a corporate entity or trust must establish not only an abuse of the corporate form, but also that such abuse resulted in fraud or injustice, and that reverse piercing is necessary to avoid an injustice (or in other words that the claimant lacks an adequate remedy at law). Thus, reverse piercing should be a tool of last resort; too-frequent imposition of such liability could "bypass[] normal judgment-collection procedures" in a manner prejudicing "non-culpable shareholders." *Cascade Energy*, 896 F.2d at 1577.

¶80 As a practical matter, this principle of liability has teeth only for individual acts falling beyond the reach of the doctrine of *respondeat superior*. For acts within the scope of employment, after all, the corporate entity or trust would have *respondeat superior* liability. So there would be no practical need for reverse veil-piercing for individual acts covered by that doctrine. And reverse piercing would come into play only for acts falling within an independent course of conduct not covered by *respondeat superior*.

¶81 We conclude that reverse piercing would be inappropriate in this case under the above standards. M.J. has identified a threshold basis in the record for concluding that the Trust was Jeffs's alter ego. And she has also adequately asserted the perpetration of a grave injustice. But the other elements of the standard for reverse piercing are lacking.

¶82 First, the Trust is subject to vicarious liability under the doctrine of *respondeat superior*. For that reason M.J. has access to an adequate legal remedy. So it cannot be said that reverse piercing is necessary to avoid an injustice in this case.

¶83 Second, equitable considerations also cut against the imposition of reverse piercing liability in this case. As noted above, veil-piercing is most easily invoked in cases involving a limited number of shareholders or trustees, or at least an unusual unity of interest and purpose. *See supra* ¶ 75. Conversely, equitable

---

[22] *See, e.g., Zahra Spiritual Trust v. United States*, 910 F.2d 240, 244-46 (5th Cir. 1990) (concluding that the veil of a trust could be pierced to satisfy taxpayer liabilities if the trust was used as an alter ego).

considerations may counsel against reverse piercing in cases involving adverse impacts on innocent third parties. *See supra* ¶¶ 75-76. And in our view these concerns counsel against reverse piercing in this case.

¶84 This is not a case involving a limited number of shareholders or trustees. The Trust's beneficiaries, rather, include innocent third parties whose interests could be adversely affected if the Trust's veil is pierced. Some of those beneficiaries may themselves have claims against the Trust. And because those claims could be jeopardized by the remedy of reverse veil-piercing, and M.J. has access to a legal remedy under the doctrine of *respondeat superior*, we conclude that this is not an appropriate case for reverse piercing. We hold that the Trust is entitled to summary judgment on that limited basis.

————————