2021 UT 55

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LaMar Drew and LaRene Drew,
*Respondents,*

*v.*

Pacific Life Insurance Company,
*Petitioner.*

No. 20190695
Heard March 5, 2021
Filed September 2, 2021

On Certiorari to the Utah Court of Appeals

Fourth District, Utah County
The Honorable Darold J. McDade
No. 120402017

Attorneys:[1]

Scott M. Petersen, David N. Kelley, Tanner J. Bean, Salt Lake City,
for petitioner

Steven G. Loosle, Salt Lake City, for respondents

Justice Pearce authored the opinion of the Court in which
Chief Justice Durrant, Justice Himonas, and
Justice Petersen joined.

Associate Chief Justice Lee authored a dissenting opinion.

Justice Pearce, opinion of the Court:

## INTRODUCTION

¶1 LaMar and LaRene Drew (Drews) claim they lost a significant portion of their life savings after they followed bad

---

[1] Additional Attorneys: Sarah Elizabeth Spencer, Salt Lake City, for amicus American Council of Life Insurers in support of petitioner.

financial advice peddled by employees of R. Scott National, Inc. (RSN). The Drews claim, among other things, that RSN used intentional and negligent misrepresentations to induce them to purchase an insurance policy from Pacific Life Insurance Company (Pacific Life or Pacific) that they did not need and could not afford. The Drews also claim they followed RSN's advice to take out a reverse mortgage on their home to pay the insurance policy premiums. The question before us is whether and to what extent Pacific Life can be held liable for RSN's alleged misdeeds.

¶2    The district court denied summary judgment to the Drews and granted summary judgment to Pacific Life, reasoning that nothing RSN did was within the actual or apparent authority Pacific Life granted RSN.

¶3    The court of appeals reversed and granted partial summary judgment to the Drews. *Drew v. Pac. Life Ins. Co.*, 2019 UT App 125, ¶ 1, 447 P.3d 1257. The court of appeals held that RSN was Pacific Life's agent and that RSN's actions fell within the scope of authority Pacific Life had granted RSN. *Id.* ¶ 26. Pacific Life petitioned for certiorari.

¶4    We agree with the court of appeals that the Drews were entitled to partial summary judgment but disagree with the court of appeals' analysis. We conclude that the court of appeals erred when it ruled that Utah Code section 31A-1-301(88)(b) (2010) made RSN an "agent" of Pacific Life. We further conclude that the court of appeals misstepped when it injected respondeat superior principles into Utah Code section 31A-23a-405(2), which presumes an insurer is bound by the acts of its "appointed licensee" within the scope of the licensee's "actual (express or implied) or apparent authority." This causes us to reverse the court of appeals' decision to reverse the district court's grant of summary judgment to Pacific Life on the issue of whether RSN acted with actual authority from Pacific Life. We also vacate the court of appeals' decision to grant partial summary judgment to the Drews. Instead, we rule on an alternative ground the Drews assert and remand to the district court to enter partial summary judgment to the Drews on the question of whether RSN acted with apparent authority from Pacific Life.

## BACKGROUND

*Pacific Life's Relationship with RSN*

¶5    RSN is a business formed to provide various products and financial services, with a focus on marketing insurance products to senior citizens. Multiple insurance companies contracted with and appointed RSN to act as an insurance producer for them—that is, to

solicit and procure applications for their products and services. One such company was Pacific Life.

¶6 Pacific Life provides life insurance and annuity products. It contracts with other businesses and individuals to help it solicit and procure applications from potential customers in Utah. And, pursuant to Utah law, it reports to the Utah Insurance Department when it "appoint[s]" such a business or individual "as an insurance producer, limited line producer, or managing general agent to act on the insurer's behalf . . . ." *See* UTAH CODE § 31A-23a-115(1).

¶7 Pacific Life appointed RSN as an "insurance producer" on December 20, 2008. On January 5, 2009, Pacific Life and RSN entered into a "Producer's Contract" (Contract) that authorized RSN to "solicit and procure applications for [Pacific Life's] insurance and annuity products . . ., to deliver policies and to perform other duties relating to the sale of such products as may be required by [Pacific Life]." This seemingly broad grant of authority was tempered by the Contract's general limitation on RSN's authority: "[RSN] has no authority except as is expressly granted in this contract."

¶8 Further, even though the Contract stated that RSN is an "independent contractor," not an "employee," and is "free to exercise independent judgment as to the time, place, and means of performing all acts under this contract," the Contract allowed Pacific to intrude on RSN's autonomy in several ways. The Contract gave Pacific Life the "right to audit" RSN. It also required RSN to comply with various rules, including "all applicable Insurance laws and regulations." And RSN needed to abide by Pacific Life's "underwriting and issue requirements" as well as its "rules, procedures and practices regarding the sale of the products and delivery and servicing of the policies." The Contract similarly barred RSN from engaging in "any act prohibited under this contract, by [Pacific Life] rule, procedure or practice, or by law."

¶9 The Contract further narrowed RSN's authority with a number of specific limitations. For example, the Contract limited RSN to soliciting and submitting applications only for products that are "authorized" and that "meet the customer's insurance needs and financial objectives." The Contract also required RSN to inform Pacific Life "of all material facts . . . relating to the insureds or proposed insureds prior to issuance and delivery of policies." And it prohibited RSN from "deliver[ing] any policy if [RSN] . . . knows, or should know, that . . . facts are not as represented in the application."

¶10 In addition, the Contract restricted the statements and materials RSN could utilize when interacting with prospective customers. It barred RSN from binding Pacific Life "by any promise

or agreement," including "any promises respecting any policy, except when specifically authorized in writing to do so by an authorized officer of [Pacific Life]." It also precluded RSN from "issu[ing], circulat[ing] or us[ing] in any manner any sales, advertising or marketing material without [Pacific Life's] prior written consent."

¶11 Moreover, RSN could not "incur any debt, expense, or liability" in Pacific's name or account. Nor could RSN "[m]ake, modify, or discharge any insurance contract on behalf of [Pacific]." But the Contract required RSN to provide applicants "with the proper temporary insurance agreement" and "[p]romptly effect delivery of policies to policyowners."

¶12 The Contract also contemplated the possibility that RSN might entangle Pacific in legal troubles. It required RSN to "immediately notify" Pacific Life "of any customer complaint, or of the service of any paper or process regarding any legal or administrative action, investigation, or proceeding against [Pacific Life] or [RSN] that involves . . . [Pacific Life's] products."

*The Drews' Relationship with RSN and Pacific Life*

¶13 The Drews are retirees who saw an RSN advertisement. Starting in November 2008, the Drews sought financial advice from one of RSN's employees. During their relationship with RSN, the Drews made numerous financial investments and transactions, only some of which are relevant to the case before us.

¶14 Two of the transactions the Drews undertook with RSN's advice and assistance were to purchase life insurance from PHL Variable Insurance Company (PHL) and Pacific Life. The Drews purchased the PHL policy in December 2008. The Drews submitted an application to Pacific Life in April 2009 and purchased the Pacific policy in July 2009.[2]

¶15 The Drews purchased the PHL and Pacific Life policies based on their belief in RSN's representations that, after two years of paying the policies' annual premiums, they could resell the policies on the secondary market for a large profit. The Drews also followed

---

[2] Pacific Life paid RSN a commission for soliciting the Drews' business with Pacific.

RSN's advice to fund the premiums by taking out a reverse mortgage on their home.[3]

¶16 The Drews testified in a deposition that they never spoke directly with Pacific Life. Rather, the Drews relied on RSN to inform them about Pacific's products and supply them with Pacific's application forms. The application forms and a temporary insurance agreement that RSN presented to the Drews had been supplied by Pacific to RSN.

¶17 Pacific asserts that "Mr. Drew signed the application without reading any of its contents because [RSN] represented that [it] would fill out the rest." The Drews admit that they signed the insurance forms with many details blank. But they claim they did so after RSN assured them that RSN would fill in the details for them later. Mr. Drew also testified that "we didn't read most of the things" RSN provided.

¶18 However, the Drews assert that they "believed that RSN was the agent of Pacific because RSN had the forms and other information necessary to sell Pacific's products." Mr. Drew testified that he "felt" that RSN "represented Pacific Life and had the authority to do whatever it curtailed to sign" the forms, both because RSN "told us that [they] represented each" insurance company, and because RSN "gave me all the information." Mr. Drew also testified that his basis for believing that RSN was "representing" Pacific was "the same" as for his belief that RSN also represented another company, Phoenix, because RSN had given him "information and the forms and so forth that we went through." Mr. Drew further testified that he believed RSN represented multiple insurance companies and "represented the company that he was talking about insuring with me."

¶19 Similarly, when Mrs. Drew was asked if RSN ever told her that RSN "worked for Pacific Life," she responded, "Well, [RSN] was

---

[3] The precise timing of when the Drews took out this reverse mortgage is not apparent in the record. Neither Pacific nor the Drews provide a specific date in their briefing. Before the district court, Pacific Life stated that the Drews met with a reverse mortgage broker on December 16, 2008, but did not state when the reverse mortgage was actually executed. Further, the parties agree that the Drews used the reverse mortgage to fund not only the premiums for the Pacific Life policy issued in July 2009, but also premiums for the PHL policy issued on December 26, 2008. Neither party states when the premiums were due or paid.

selling your product and so it was on your papers." Mrs. Drew reiterated she believed RSN was an "agent" of Pacific Life and other companies because RSN "had papers from" Pacific Life and other companies.

¶20 Two years after purchasing the Pacific Life and PHL policies, RSN failed to sell either policy on the secondary market. The Drews then stopped paying the hefty annual premiums and the policies lapsed. The profits the Drews had expected from these life insurance investments never materialized. The Drews lost a portion of their savings and the equity in their home.

*The Drews' Lawsuit*

¶21 The Drews sued several entities and individuals, including RSN and Pacific Life. The Drews' second amended complaint (Complaint) alleged several causes of action against all defendants, including Pacific Life, for "common law fraud," "negligent misrepresentation," breach of fiduciary duty, negligence, unjust enrichment, elder abuse, intentional infliction of emotional distress, and "constructive fraud." The Complaint also included a claim for "rescission of illegal insurance contract" solely against Pacific Life.

¶22 The Drews' Complaint alleged that they reasonably relied on a number of RSN's misrepresentations and omissions and that they suffered damages as a result. The Drews alleged that RSN failed to disclose the "significant risks" in RSN's "scheme" to resell the life insurance policies at a profit. The Drews also alleged that RSN "[f]ailed to disclose that it is illegal to solicit or issue a life insurance policy for the primary purpose of selling the policy" on the secondary market.[4] And they claimed that RSN misrepresented the risks of using a reverse mortgage to finance the purchase of the policies.

¶23 The Drews contended that Pacific Life was responsible for "all actions" of RSN "in soliciting and procuring insurance products from the Drews."

---

[4] Between the time the Drews applied for the Pacific Life policy in April 2009 and when they purchased it in July 2009, a statute went into effect which made it illegal for any person to "issue, solicit, or market" a life insurance policy or annuity for the "primary purpose of or with a primary emphasis on" selling the policy on the secondary market. *See* Insurance and Life Settlement Amendments, H.B. 170, § 17, 2009 Utah Laws 1885, 1900 (effective May 12, 2009) (codified at UTAH CODE § 31A-36-111(5)).

*The District Court Grants Summary Judgment to Pacific*

¶24 Pacific Life moved for summary judgment. The Drews cross-moved for partial summary judgment. Both motions focused on whether Pacific Life could be held liable for RSN's alleged wrongdoing.[5]

¶25 Pacific Life argued that RSN and its employees "were not Pacific Life's captive agents, but were instead independent contractor[s]." Pacific Life also argued that RSN did not have actual or apparent authority to act on its behalf. Pacific further contended that some of RSN's "bad acts"—including convincing the Drews to obtain a reverse mortgage and to put money into life insurance annuities—occurred "<u>before</u> [the Drews] were made aware of Pacific Life." Pacific explained RSN *began* recommending that the Drews invest in life insurance annuities and *began* discussing the option of a reverse mortgage in November 2008. Pacific Life argues that this occurred before Pacific appointed RSN to sell its products on December 20, 2008. Because these conversations *began* prior to Pacific's appointment of RSN, Pacific contended that these acts "cannot be attributed to" Pacific Life.

¶26 The Drews alleged that "RSN's breaches of duty caused the Drews to purchase insurance and pay premiums to Pacific." And they argued that "Pacific is responsible for all actions of RSN in selling Pacific's products." The Drews contended that they were "entitled to summary judgment on the issue of agency" because RSN acted as Pacific's agent under Utah Code section 31A-1-301(88) (2010) and as Pacific's appointed licensee under Utah Code section 31A-23a-115. The Drews further asserted that "all of the misconduct alleged in this case as to Pacific occurred in the scope of RSN's authority as an appointed agent of Pacific in soliciting the sale of its products." Therefore, the Drews concluded, Pacific is liable under Utah Code section 31A-23a-405(2) for RSN's actions in selling Pacific's products to the Drews.

¶27 The district court denied the Drews' motion and granted summary judgment to Pacific Life, disposing of all but one of the Drews' claims. That claim later met the same fate. The court reasoned that RSN's misdeeds were neither within the actual nor apparent authority that Pacific Life granted RSN. The court

---

[5] By that time, the Drews had already reached a settlement with RSN, PHL, and multiple others. The Drews' summary judgment motion was solely against Pacific and one of RSN's individual employees. Only the claims against Pacific are at issue before us.

determined that RSN lacked actual authority because the Producer's Contract contained specific limitations on RSN's authority, including prohibitions on: delivering policies if the "facts are not as represented in the application"; soliciting policies that do "not meet the customer's insurance needs and financial objectives"; "making any promises respecting any policy, except when specifically authorized"; binding Pacific Life "by any promise"; and engaging in "any act prohibited under this contract . . . or by law."

¶28 The district court also concluded that RSN lacked apparent authority by reasoning that

> Pacific Life made no manifestations to [the Drews] that the RSN Defendant's [sic] had authority to make promises to the [Drews] regarding the purchase of life insurance for the purpose of selling that insurance on the secondary market or for any other alleged illegal act or omission noted in the Second Amended Complaint.

The court further reasoned that the Drews "dealt exclusively with the RSN Defendants and relied solely on their representations." The court concluded that "the RSN Defendants' use of Pacific Life's insurance application forms, without additional representations from Pacific Life to [the Drews], was insufficient to establish that the RSN Defendants were acting with apparent authority from Pacific Life."

¶29 The district court did not address whether RSN was Pacific Life's agent. Nor did the court address Pacific's argument that some of RSN's misdeeds began before the Drews were "aware of Pacific Life" and thus "cannot be attributed to" Pacific Life.

*The Court of Appeals Reverses and
Grants Partial Summary Judgment to the Drews*

¶30 The court of appeals reversed the district court and granted partial summary judgment to the Drews on the question of vicarious liability. *Drew v. Pac. Life Ins. Co.*, 2019 UT App 125, ¶ 1, 447 P.3d 1257. The court of appeals held that the proper analytical framework requires a court to first decide "whether an agency relationship existed between Pacific and RSN" and, if yes, "then determine whether RSN's employees acted within the scope of their authority in their dealings with the Drews." *Id.* ¶ 10. The court of appeals concluded that RSN was an agent of Pacific Life based on a provision of the Insurance Code that designates a person as a "producer for the insurer" if the person is "compensated directly or indirectly by an insurer for selling, soliciting, or negotiating an insurance product of

that insurer." *Id.* ¶¶ 12–13 (quoting UTAH CODE § 31A-1-301(88)(b)(i) (2010) (amended and renumbered as § 31A-1-301(98)(b))).[6]

¶31 The court of appeals next concluded that RSN acted within the "scope of their authority" granted by Pacific. *Id.* ¶¶ 24, 26. The court of appeals quoted Utah Code section 31A-23a-405(2), which makes every insurer "bound by any act of its appointed licensee . . . within the scope of the appointed licensee's actual (express or implied) or apparent authority." *Id.* ¶ 17. But the court of appeals did not expressly examine whether RSN acted with actual express, actual implied, or apparent authority.

¶32 Instead, the court of appeals concluded that RSN acted generally "within the scope of their authority." *Id.* ¶¶ 24, 26. In so concluding, the court primarily cited and applied the respondeat superior "scope of employment" test found in section 230 of the Restatement (Second) of Agency (Am. L. Inst. 1958), section 7.07 of the Restatement (Third) of Agency (Am. L. Inst. 2006), *M.J. v. Wisan*,

---

[6] We cite the version of the statute the court of appeals cited, *see Drew*, 2019 UT App 125, ¶ 12 n.5, which is the same version of the statute that was in effect when RSN solicited the Drews and convinced them to purchase life insurance from Pacific in 2008 and 2009. *Compare* UTAH CODE § 31A-1-301(88)(b) (2010), *with id.* § 31A-1-301(88)(b) (2008), *and id.* § 31A-1-301(88)(b) (2009). In 2011, the legislature amended this statute, adding that a "'[p]roducer for the insurer' may be referred to as an 'agent'" and a "'[p]roducer for the insured' may be referred to as a 'broker.'" *See* Insurance Law Related Amendments, H.B. 19, § 1, 2011 Utah Laws 1111, 1119–20 (currently codified at UTAH CODE § 31A-1-301(98)(b), (c)). Even though the court of appeals did not quote this new language, Pacific argues that the court of appeals implicitly and wrongfully incorporated it into its analysis. We do not address the potential effect of these amendments to RSN's agency status because we determine that such questions are not relevant under the Drews' theory of liability. *See infra* ¶ 41. We also therefore need not address whether the court of appeals improperly applied the 2011 amendments, because we vacate that portion of the court of appeals' decision. *See infra* Part I. Nevertheless, for the sake of thoroughness and transparency, and because Pacific makes a point of it, we cite the version of the statute in effect at the time of the alleged misconduct. *See Carlucci v. Utah State Indus. Comm'n*, 725 P.2d 1335, 1336 (Utah 1986) ("The general rule is that the law establishing substantive rights and liabilities when a cause of action arises, and not a subsequently enacted statute, governs the resolution of the dispute.").

2016 UT 13, ¶ 54, 371 P.3d 21, *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 19, 61 P.3d 1009, and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 756 (1998). *See Drew*, 2019 UT App 125, ¶¶ 18–24; *see also infra* ¶¶ 59–61. The court of appeals also relied on cases from outside of Utah which apply a blend of vicarious liability and authority tests. *See Drew*, 2019 UT App 125, ¶¶ 22–23; *see also infra* ¶¶ 64–68.

## ISSUES AND STANDARD OF REVIEW

¶33 We granted Pacific Life's petition for certiorari on the question of "[w]hether the court of appeals erred in its construction and application of former Section 31A-1-301(88) and Section 31A-23a-405 of the Utah Code." In plainer terms, the ultimate question before us is whether or to what extent section 405 makes Pacific Life liable for RSN's actions.

¶34 "On certiorari, we review the court of appeals' decision for correctness, focusing on whether that court correctly reviewed the trial court's decision under the appropriate standard of review." *Cheek v. Iron Cnty. Att'y*, 2019 UT 50, ¶ 9, 448 P.3d 1236 (citation omitted). In other words, "[i]n reviewing the court of appeals' decision[,] we apply the same standard of review that it would apply in reviewing the decision of the district court." *Est. of Faucheaux v. City of Provo*, 2019 UT 41, ¶ 9, 449 P.3d 112.

¶35 Here, we review a grant and a denial of summary judgment. *See Drew v. Pac. Life Ins. Co.*, 2019 UT App 125, ¶ 1, 447 P.3d 1257. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." UTAH R. CIV. P. 56(a). "[W]hen an appellate court reviews a district court's grant of summary judgment, the facts and all reasonable inferences drawn therefrom [are viewed] in the light most favorable to the nonmoving party, while the district court's legal conclusions and ultimate grant or denial of summary judgment are reviewed for correctness." *Bangerter v. Petty*, 2009 UT 67, ¶ 10, 225 P.3d 874 (second alteration in original) (citation omitted). We assess whether the court of appeals erred by looking at "whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact." *Glover ex rel. Dyson v. Boy Scouts of Am.*, 923 P.2d 1383, 1385 (Utah 1996) (citation omitted).[7]

---

[7] "The filing of cross-motions for summary judgment does not necessarily mean that material issues of fact do not exist." *Plateau*

(continued . . .)

**ANALYSIS**

¶36 Pacific Life argues that the court of appeals erred when it overturned the district court and granted partial summary judgment to the Drews. Pacific Life primarily contends it cannot be held liable for RSN's acts for two reasons. First, Pacific Life avers that the court of appeals erred in determining that RSN was its "agent." Second, Pacific Life asserts that the court of appeals applied an incorrect test to assess RSN's authority under Utah Code section 31A-23a-405.

## I. RSN WAS PACIFIC LIFE'S "APPOINTED LICENSEE"

¶37 The court of appeals, Pacific Life, and the Drews all believe that, in order to hold Pacific liable for RSN's actions, the first question the court should answer is whether RSN was Pacific's "agent." *See Drew v. Pac. Life Ins. Co.*, 2019 UT App 125, ¶¶ 10–11, 447 P.3d 1257. But they disagree on the proper test to determine agency.

¶38 The court of appeals held that the Insurance Code makes "the existence of an agency relationship turn[] on whether an insurance salesperson is a 'producer for the insurer' or a 'producer for the insured.'" *Id.* ¶ 12 (quoting UTAH CODE § 31A-1-301(88) (2010) (amended and renumbered at § 31A-1-301(98)). The court of appeals believed that question hinged on whether the insurance "producer" was "compensated directly or indirectly by an insurer for selling, soliciting, or negotiating an insurance product of that insurer." *Id.* (quoting UTAH CODE § 31A-1-301(88)(b)(i) (2010)). The court of appeals concluded that, because Pacific paid RSN a commission, RSN and its employees were "producers for Pacific and were therefore acting as its agents." *Id.* ¶ 13.

¶39 Pacific Life contends that "agency" is not defined by the statutory terms "producer for the insurer" and "producer for the insured" under Utah Code section 31A-1-301(88) (2010). Instead, Pacific argues that a court should apply the common law test for agency.

¶40 The Drews agree with the court of appeals that RSN was Pacific's agent because it was a producer for the insurer under Utah

---

*Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) (citing *Amjacs Interwest, Inc. v. Design Assocs.*, 635 P.2d 53, 55 (Utah 1981)). "Cross-motions for summary judgment do not ipso facto dissipate factual issues, even though both parties contend for the purposes of their motions that they are entitled to prevail because there are no material issues of fact." *Amjacs Interwest*, 635 P.2d at 55.

Code section 31A-1-301(88) (2010). But the Drews also reason that RSN was Pacific's agent because Utah Code section 31A-23a-405(2) makes an insurer "bound by any act of its appointed licensee . . . that is within the scope of the appointed licensee's actual (express or implied) or apparent authority," and Pacific appointed and contracted with RSN to act on its behalf pursuant to Utah Code section 31A-23a-115(1).

¶41  We agree with Pacific Life that the court of appeals erred in asking whether Pacific Life was a "producer for the insurer." But we disagree with Pacific that we must apply a common law agency test. The relevant questions in this case are whether RSN was Pacific Life's appointed licensee and whether RSN acted within its scope of actual or apparent authority. This is because the Drews' theory of liability is rooted in Utah Code section 31A-23a-405(2).[8] The Drews do not rely on any theory of liability that is untethered from that statute. Indeed, the Drews argued to the district court and the court of appeals that section 405(2) governed their claims.[9]

---

[8] Pacific appears to agree as well. Pacific asserts that "[b]ecause Section 31A-23a-405(2) is specifically directed toward the parameters of insurer and agent liability, resort to Section 31A-1-301(88) is unnecessary," and "[i]t is Section 31A-23a-405(2) . . . that governs questions of agency under the Insurance Code, not Section 31A-1-301(88) . . . ."

[9] We note that, although the title of section 405 is "Insurer liability," subsection 31A-23a-405(2) creates a "rebuttable presumption that every insurer is *bound by* any act of its appointed licensee . . .," and it does not use the words "liable for." *See* UTAH CODE § 31A-23a-405(2) (emphasis added). And the subsequent subsection discusses the remedies available when "a licensee under this chapter with authority to *bind* more than one insurer *on a particular risk* agrees to *bind coverage* on a *particular risk*, but fails to outwardly indicate the insurer with which the risk is placed, and before the risk is placed with a particular insurer a loss occurs. . . ." *Id.* § 31A-23a-405(3) (emphases added). With that context, the phrase "bound by" in section 31A-23a-405(2) could be read to speak to the question of when an insurer must provide insurance, rather than when an insurer can be liable for its appointed licensee's tortious conduct. But both parties have briefed the case as if section 405(2) governs this dispute and neither party, nor amicus, nor the court of appeals in its opinion, has suggested that the statute is inapplicable to the Drews' tort claims. We therefore analyze what section 405(2)

(continued . . .)

¶42 Because the questions the parties have put before us turn on the meaning of section 31A-23a-405(2), we approach them as a matter of statutory interpretation. We look first to the Act's plain language. *See, e.g., Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465; *Dowling v. Bullen*, 2004 UT 50, ¶ 8, 94 P.3d. 915.

¶43 Section 405(2) provides:

> There is a rebuttable presumption that every insurer is bound by any act of its *appointed licensee* performed in this state that is within the scope of the appointed licensee's *actual (express or implied) or apparent authority*, until the insurer has canceled the appointed licensee's appointment and has made reasonable efforts to recover from the appointed licensee its policy forms and other indicia of agency.

UTAH CODE § 31A-23a-405(2) (emphases added).

¶44 Section 405 thus speaks to two questions pertaining to when an insurer is presumed to be bound. First, it addresses *who* can bind the insurer under this section: "appointed licensee[s]." *Id.* Second, it speaks to *what* an insurer can be bound to: acts "within the scope of the appointed licensee's actual (express or implied) or apparent authority." *Id.*

¶45 The Insurance Code does not define "appointed licensee." *See* UTAH CODE § 31A-1-301 (definitions); *id.* §31A-23a-102 (definitions). However, we may glean its meaning from other related sections of the Insurance Code. *See, e.g., Olsen*, 2011 UT 10, ¶ 9 ("In [some] cases, the statutory text may not be 'plain' when read in isolation, but may become so in light of its linguistic, structural, and statutory context." (citation omitted)); *id.* ¶ 12 ("[W]e do not interpret the 'plain meaning' of a statutory term in isolation. . . . [We] determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)."); *Dowling*, 2004 UT 50, ¶ 8 ("[S]ubsections of a statute should not be construed in a vacuum but must be read as part of the statute as a whole." (citation omitted)).

¶46 The term "appointed licensee" in section 405(2) appears to relate to the requirement in section 115 that insurers "shall *appoint* an individual or agency with whom it has a contract as an insurance

---

requires to bind an insurer to the acts of its appointed licensee, but we leave open the question of the statute's scope for a case in which the parties have raised and briefed the question.

producer, limited line producer, or managing general agent to act on the insurer's behalf in order for *the licensee* to do business for the insurer in this state." UTAH CODE § 31A-23a-115(1)(a) (emphases added). Insurers must report "new appointment[s]" to the state insurance commissioner. *See id.* § 31A-23a-115(1)(b). An "insurance producer" is defined as a "person licensed or required to be licensed under the laws of this state to sell, solicit, or negotiate insurance." *See id.* § 31A-1-301(88) (2010) (amended and renumbered at § 31A-1-301(98)(a)).

¶47  Reading Utah Code section 31A-23a-405(2) in the context of these statutory provisions, "appointed licensee" refers to a person or entity with whom an insurer "has a contract as an insurance producer, limited line producer, or managing general agent" and who the insurer has "appoint[ed]" in filings to the state insurance commissioner "to act on the insurer's behalf." *See id.* § 31A-23a-115(1).

¶48 There is no dispute that Pacific Life filed a notice of appointment with the Utah Insurance Department and appointed RSN as an "insurance producer" on December 20, 2008. It is also undisputed that, on January 5, 2009, Pacific Life and RSN entered into a "Producer's Contract" that authorizes RSN to "solicit and procure applications for [Pacific Life's] insurance and annuity products, to deliver policies and to perform other duties relating to the sale of such products as may be required by [Pacific Life]." Based on these undisputed facts, RSN was an "appointed licensee" of Pacific Life within the meaning of Utah Code section 31A-23a-405(2).

¶49 Although Pacific Life conceded at oral argument that RSN was its appointed licensee, it urged us to recognize an additional hurdle that a plaintiff must clear before binding the insurer to the acts of its appointed licensee. Pacific contends that an insurer cannot be held liable for the acts of its appointed licensee unless that licensee is also an "agent" under common law principles. We see nothing in the statute that supports that contention. The statute binds an insurer to the acts of its "appointed licensee" in certain circumstances. Nothing in the statute suggests that the appointed licensee must also meet the common law test for an agency relationship before the insurer can be bound.[10]

---

[10] Pacific Life also argues that if we read the statute the way we do, insurers will be strictly liable for the actions of their appointed licensees. This again misreads the statute. The provision of the Insurance Code the Drews put at issue creates a rebuttable

(continued . . .)

¶50 In sum, we conclude that the court of appeals erred by looking to Utah Code section 31A-1-301(88) (2010) to determine whether RSN was Pacific Life's agent for the purpose of assessing liability under section 405(2). *See Drew*, 2019 UT App 125, ¶¶ 12–13. The relevant question is whether RSN was Pacific's "appointed licensee." It was.

## II. THE COURT OF APPEALS ERRED IN TURNING TO TESTS THAT UTAH CODE SECTION 31A-23A-405(2) DOES NOT CONTEMPLATE

¶51 Pacific Life next contends that the court of appeals applied an incorrect test to determine RSN's authority under Utah Code section 31A-23a-405(2). Pacific argues that the court of appeals should have, but did not, undertake separate analyses for actual express, actual implied, and apparent authority. Pacific explains that instead of following the statute's lead and looking at those questions, the court of appeals applied respondeat superior principles. Pacific also contends that the court of appeals distorted the statutory analysis by relying on cases from outside Utah that do not reflect the way this court has looked to see whether a party acted inside its actual or apparent authority. We agree with Pacific that the court of appeals strayed from the statute when it resorted to respondeat superior principles and relied on ill-fitting cases from outside the Beehive State.

¶52 Utah Code section 31A-23a-405(2) provides:

> There is a rebuttable presumption that every insurer is bound by any act of its appointed licensee performed in this state that is *within the scope of* the appointed licensee's *actual (express or implied) or apparent authority*
>
> . . . .

(Emphases added.) This is an express statutory mandate that insurers are presumed to be bound by certain acts of their appointed licensees: acts within the licensee's *actual express authority*, *actual implied authority, or apparent authority*. *Id.* It does not expressly premise insurer liability on the doctrine of respondeat superior.

¶53 Actual express authority, actual implied authority, and apparent authority are all terms of art borrowed from common law. When the legislature plants common law terms of art into a statute,

---

presumption that binds insurers only to those actions that their appointed licensees takes within the scope of their actual or apparent authority. UTAH CODE § 31A-23a-405(2).

we presume that the legislature intends to incorporate the "old soil" of those terms' common law meanings. *See Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (citation omitted).

¶54 Actual and apparent authority are doctrines that bind a principal to its agent's acts. *See Zions First Nat. Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988). Actual authority includes both express and implied authority. *Id.* "Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf." *Id.* Implied authority includes "acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id.*

¶55 While actual authority "relates to a principal's manifestations to the agent," apparent authority "relates to a principal's manifestations to a third party." *Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 21, 345 P.3d 531. Apparent authority exists "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* (quoting RESTATEMENT (THIRD) OF AGENCY § 2.03 (AM. L. INST. 2006)).

¶56 The court of appeals looked past these doctrines and instead inserted respondeat superior concepts into its analysis. "Under the doctrine of respondeat superior, employers are held vicariously liable for the torts their employees commit when the employees are acting within the scope of their employment." *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1040 (Utah 1991); *see also Phillips v. JCM Dev. Corp.*, 666 P.2d 876, 881 (Utah 1983). We have maintained that at least two factors are relevant to determining whether something was within the "scope of employment," including whether the conduct is "of the general kind the employee is employed to perform" and whether the acts were "motivated, at least in part, by the purpose of serving the employer's interest." *Birkner v. Salt Lake Cnty.*, 771 P.2d 1053, 1056–57 (Utah 1989); *Clover*, 808 P.2d at 1040; *see also M.J. v. Wisan*, 2016 UT 13, ¶¶ 54, 59, 371 P.3d 21.

¶57 Actual authority, apparent authority, and respondeat superior are all distinct, yet sometimes overlapping doctrines. Actual authority and apparent authority "may exist concurrently or there may be one and not the other." *Burdick*, 2015 UT 8, ¶ 21 n.11 (quoting RESTATEMENT (SECOND) OF AGENCY § 124A cmt. a (AM. L. INST. 1958)). Apparent authority and the respondeat superior "scope of employment" tests also overlap but are "not equivalent concepts," and there may sometimes be liability under both, or under one and not the other. *See Kansallis Fin. Ltd. v. Fern*, 659 N.E.2d 731, 735 (Mass.

1996); *see also* Charles Davant IV, *Employer Liability for Employee Fraud: Apparent Authority or Respondeat Superior?*, 47 S.D. L. REV. 554, 556, 567–76 (2002) (delineating situations in which respondeat superior and apparent authority would result in the same outcome and those that would yield different outcomes); *Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 472–74 (Colo. 1995) (en banc) (distinguishing between the kinds of acts and persons authorized under respondeat superior and apparent authority).

¶58 Although there is overlap between respondeat superior and actual and apparent authority, the legislature chose to include explicit references to actual and apparent authority, but not to respondeat superior.[11] In the face of that seemingly deliberate legislative choice, we agree with Pacific Life that the court of appeals should not have turned to respondeat superior principles to assess insurer liability under Utah Code section 31A-23a-405(2).

¶59 But it appears that it did. Indeed, it appears that the court of appeals primarily relied on and applied respondeat superior principles to decide whether RSN acted within the scope of authority granted by Pacific. For example, the court cited section 230 of the Second Restatement of Agency and section 7.07 of the Third Restatement of Agency, both of which pertain to the respondeat superior "scope of employment" test for holding principals liable for

---

[11] The Drews argue that section 405(2) implicitly incorporates respondeat superior. The Drews contend that section 405(2) resembles the statute we interpreted in *M.J. v. Wisan*, 2016 UT 13, ¶ 48, 371 P.3d 21. That statute imposed liability on trusts for the torts their trustees committed "*in the course of* administering [the] trust." *See id.* ¶¶ 47, 69 (emphasis added) (quoting UTAH CODE § 75-7-1010(1), (2)). The Drews also point to *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, 61 P.3d 1009. There we held that an employer was vicariously liable for its employee's frauds where the employee acted within its "[s]cope of authority." *Id.* ¶¶ 26–27.

The Drews argue that section 405(2)'s reference to acts performed "within the scope" of the appointed licensee's authority signals an intent to incorporate respondeat superior principles. We credit that there is some similarity in the language but ultimately find those similarities unpersuasive given the very specific references to "actual (express or implied) or apparent authority" and the absence of a similarly explicit reference to respondeat superior. *See* UTAH CODE § 31A-23a-405(2). This sends a strong signal about how the legislature intended the statute to operate.

the acts of their "servants," or employers liable for the acts of their employees. *See Drew v. Pac. Life Ins. Co.*, 2019 UT App 125, ¶¶ 21–22, 447 P.3d 1257; RESTATEMENT (THIRD) OF AGENCY § 7.07; RESTATEMENT (SECOND) OF AGENCY § 230; *see also* RESTATEMENT (SECOND) OF AGENCY § 219(1) ("A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.").

¶60 The court of appeals also relied on a U.S. Supreme Court case, *Burlington Industries, Inc. v. Ellerth*, which applied a "scope of employment" respondeat superior standard to determine an employer's vicarious liability for the acts of its employees. *See* 524 U.S. 742, 755–56 (1998) (citing sections 219 and 230 of the Second Restatement of Agency, which elaborate on the "scope of employment" test); *see also Drew*, 2019 UT App 125, ¶ 22. And the court of appeals cited *Wardley Better Homes & Gardens v. Cannon* and *M.J. v. Wisan*, *see Drew*, 2019 UT App 125, ¶¶ 18, 24, both of which utilize a respondeat superior analysis. *See Wisan*, 2016 UT 13, ¶¶ 48–49; *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶¶ 25–27, 61 P.3d 1009 (examining whether an employee's frauds fell within his "scope of authority" by citing cases that apply the respondeat superior "scope of employment" test (citing, *e.g.*, *Birkner*, 771 P.2d at 1056)).

¶61 Further, when the court of appeals analyzed the facts of this case, it concluded that RSN's representations and misrepresentations about Pacific's policies to make a sale "served Pacific's interest[s]" and were "consistent with the general work with which RSN was entrusted." *Drew*, 2019 UT App 125, ¶ 24. That analysis applies the factors this court has utilized when assessing respondeat superior liability. *See Wisan*, 2016 UT 13, ¶ 54; *Birkner*, 771 P.2d at 1056–57 (explaining that two respondeat superior "scope of employment" factors are whether the conduct is "of the general kind the employee is employed to perform" and whether the acts were "motivated, at least in part, by the purpose of serving the employer's interest").

¶62 The Drews acknowledge that the court of appeals applied the respondeat superior test *Wisan* described. *See* 2016 UT 13, ¶¶ 54, 59. But the Drews also assert that the court of appeals additionally "took into account" and properly applied "both the actual express and implied authority standard" from *Zions First National Bank v. Clark Clinic Corp.*, 762 P.2d 1090 (Utah 1988). We disagree.

¶63 The court neither explained, nor cited, nor otherwise outwardly accounted for the test for actual *express* authority we applied in *Zions First National Bank*. Second, although the court of appeals did quote the actual *implied* authority test from *Zions First National Bank*, 762 P.2d at 1094, and distinguished the facts of an

implied authority case, *Bodell Constr. Co. v. Stewart Title Guaranty Co.*, 945 P.2d 119, 124–25 (Utah Ct. App. 1997), the court's analysis was infused with respondeat superior principles. *See Drew*, 2019 UT App 125, ¶¶ 19–21. In fact, in the process of factually distinguishing from *Bodell*, the court of appeals cited section 230 of the Second Restatement of Agency, *id.* ¶ 21, which, as discussed above, pertains to respondeat superior. *See supra* ¶ 59. And the rest of the court's analysis relied upon other respondeat superior sources, as discussed above. *See supra* ¶¶ 60–61. Therefore, to the extent the court of appeals, in the Drews' words, "took into account" the potential that RSN acted with implied authority when it quoted *Zions National Bank*, it did so only superficially. Respondeat superior principles are what dominated the court of appeals' analysis. And that was error.

¶64 Pacific Life also avers that the court of appeals erred when it relied on several extra-jurisdictional cases that employ standards that are inconsistent with the actual express, actual implied, and apparent authority tests recognized in Utah caselaw. We agree.

¶65 For example, the court of appeals dedicated a paragraph to analogizing the Drews' situation to that in an unreported California Court of Appeals case, *Weyand v. Union Central Life Insurance Co.*, No. G051071, 2016 WL 750433 (Cal. Ct. App. Feb. 26, 2016). *See Drew*, 2019 UT App 125, ¶ 23.[12] The *Weyand* court held that an insurer may be vicariously liable for its "agent's acts and representations within the ordinary scope of the insurance business . . . even if the agent violates the insurer's instructions or limitations on the agent's authority unless the injured insured had actual or constructive notice of the limits on the agent's authority." 2016 WL 750433, at *1; *see id.* at *7.

¶66 *Weyand* does not shed much light on liability under section 405 for several reasons. First, it appears that the California rule applies to "general agent[s]," not necessarily other types of agents. *See id.* at *4. And, since it has not been argued here that RSN was a "general agent," it is not clear, even if Utah followed such a rule, that it would apply here. Second, the vicarious liability test in *Weyand* appears to be some blend of respondeat superior and apparent authority. The court examined: whether an action falls within the

---

[12] *Weyand* is an unpublished opinion. *See Weyand v. Union Cent. Life Ins. Co.*, No. G051071, 2016 WL 750433 (Cal. Ct. App. Feb. 26, 2016). An unpublished opinion ordinarily cannot be cited or relied upon in California courts. *See* CAL. CT. R. 8.1115(a). Its persuasive effect with us, therefore, is yet further reduced.

"ordinary scope of the insurance business," *see id.* at *1, *4, *5, *7; whether the agent "represented he had such authority," *id.* at *6; and whether the plaintiff had "notice of any limits the insurer placed on the agent's authority," *id.* at *7; *see id.* at *5; *see also id.* at *6 ("[T]he absence of substantial evidence of apparent or actual authority . . . eliminates any basis upon which to impose vicarious liability . . . under the doctrine of respondeat superior." (citation omitted)). We do not see how the *Weyand* court's "ordinary scope of the insurance business" test or blended respondeat superior-apparent authority test fits with Utah Code section 31A-23a-405(2). And neither the Drews nor the court of appeals offer any persuasive reason why *Weyand* would help us understand Utah law on the topic.

¶67 The court of appeals also invoked *Dias v. Nationwide Life Insurance Co.*, 700 F. Supp. 2d 1204 (E.D. Cal. 2010). The court of appeals cited *Dias* to conclude that RSN had authority to "induce the purchase of a policy . . . by misrepresenting the nature of a product or policy term." *Drew*, 2019 UT App 125, ¶ 19 (alteration in original) (quoting *Dias*, 700 F. Supp. 2d at 1221). Like *Weyand, Dias* does not reflect our relevant precedent. The *Dias* court employed a rule that appears to blend implied authority and apparent authority, stating that "an insurance agent . . . possesses such powers as have been conferred by the company, or as third persons have a right to assume that he possesses under the circumstances," *Dias*, 700 F. Supp. 2d at 1220 (citation omitted), whereas persons who have "knowledge of the limitations" imposed by a principal on an agent "are bound by the restrictions imposed." *Id.* at 1219–20 (citation omitted). We find this blended test in *Dias* to be unhelpful to an understanding of Utah's common law tests for actual and apparent authority, from which Utah Code section 31A-23a-405(2) borrows. *Cf. supra* ¶¶ 53–55; *infra* ¶ 83. And neither the court of appeals nor the Drews have persuaded us otherwise. *See Drew*, 2019 UT App 125, ¶ 19.

¶68 We likewise are unpersuaded by the court of appeals' citation to *Chicago Title Insurance Co. v. Washington State Office of the Insurance Commissioner*, 309 P.3d 372 (Wash. 2013). *See Drew*, 2019 UT App 125, ¶ 22. There, the Washington Supreme Court held an insurer liable for the illegal acts of its agent under section 161 of the Second Restatement of Agency. *See Chicago Title Ins. Co.*, 309 P.3d at 381–82. That restatement section applies to "general agents" but not "special agents." *See* RESTATEMENT (SECOND) OF AGENCY § 161; *id.* § 161 cmt. h. Neither the court of appeals nor the Drews offer an explanation as to why that applies to the facts of this case. Second, section 161 applies even where "the agent has neither authority nor apparent authority," *id.* § 161 cmt. a, but Utah Code section 31A-23a-

405(2) specifically bases liability on actual and apparent authority. Neither the court of appeals nor the Drews square this inconsistency. *See Drew*, 2019 UT App 125, ¶ 22. We are therefore unpersuaded that *Chicago Title* applies here.

¶69 In addition to the caselaw, the court of appeals invoked a normative rationale to justify its broad reading of Utah Code section 31A-23a-405(2), reasoning that "[i]t makes little sense to allow insurance companies to grant broad solicitation authority to their agents . . . and accept the benefits therefrom without holding them accountable for the damages resulting." *Drew*, 2019 UT App 125, ¶ 25. The Drews similarly urge us to interpret the statute broadly because, they say, the purpose of the statute was intended to protect consumers.

¶70 We agree there are a variety of policy reasons for allowing insurers to be held liable for their agents, employees, and/or for their "appointed licensees." *See* Steven N. Bulloch, *Fraud Liability Under Agency Principles: A New Approach*, 27 WM. & MARY L. REV. 301, 303–07 (1986) (describing the "prevention," "loss spreading," and the "allocation of resources" theories justifying vicarious liability); *see also id.* at 311–14 (discussing protection of reasonable expectations and promotion of business expediency as justifications for apparent authority liability); Johnny Parker, *Company Liability for a Life Insurance Agent's Financial Abuse of an Elderly Client*, 2007 MICH. ST. L. REV. 683, 700 (2007) (explaining the "control" and "enterprise liability" theories for justifying respondeat superior); *see also Wisan,* 2016 UT 13, ¶ 51 (reasoning that an employer is more likely to satisfy a judgment than an employee and "is in a better position to 'insure against liability,'" and threat of liability incentivizes employers to take measures to "reduce the incidence of tortious conduct" (citations omitted)).

¶71 But our conclusion that Utah Code section 31A-23a-405(2) does not prescribe respondeat superior liability does not leave consumers high and dry. An insurer may indeed be bound under section 405(2) for the acts of its appointed licensees; but the test of liability to be used in analyzing a claim that invokes section 405(2) is whether the licensee possessed actual or apparent authority. That is the test the legislature has imposed, and where "the legislature has spoken our role is limited. In the face of duly-enacted legislation we no longer have a primary policymaking role." *Wisan,* 2016 UT 13, ¶ 69.

¶72 In sum, the court of appeals erred in applying a respondeat superior vicarious liability standard and blending standards from other jurisdictions, when the Drews' claims are based on a statute

that specifically premises insurer liability on actual and apparent authority. *See* UTAH CODE § 31A-23a-405(2). We accordingly vacate the court of appeals' rationale for concluding that RSN had authority from Pacific.[13]

### III. THE DREWS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT BECAUSE RSN HAD APPARENT AUTHORITY TO MAKE REPRESENTATIONS ABOUT PACIFIC LIFE'S PRODUCTS

¶73 Pacific Life argues that RSN acted outside of its actual and apparent authority and that the court of appeals should have upheld the district court's grant of summary judgment to them. The Drews contend that RSN's acts fall within the "scope of authority" granted by Pacific under the actual authority standard from *Zions First National Bank v. Clark Clinic Corp.*, 762 P.2d 1090 (Utah 1988), as well as an apparent authority standard.

¶74 We agree with Pacific Life that the court of appeals should have upheld the district court's grant of summary judgment to Pacific on the question of actual authority. But we also conclude that, on the question of apparent authority, the district court erred in granting summary judgment to Pacific and should have instead granted partial summary judgment to the Drews. We therefore affirm the court of appeals' grant of partial summary judgment to the Drews, but do so on this alternative ground.

### A. RSN Lacked Actual Authority

¶75 Actual authority includes both express and implied authority. *Zions First Nat. Bank*, 762 P.2d at 1094. "Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf." *Id.* Implied authority includes "acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id.* In other words, when "the performance of certain business is confided to an agent, such authority carries with it by implication authority to do collateral acts

---

[13] We provide no opinion on whether or the extent to which, outside of section 405, an insurer can be held liable under common law respondeat superior principles. As we have noted throughout, the Drews anchored their case to section 405. We have no briefing before us on the extent to which the Insurance Code might or might not entirely preempt common law theories of liability so we leave those questions for another case.

which are the natural and ordinary incidents of the main act or business authorized." *Id.* at 1095. "This authority may be implied from the words and conduct of the parties and the facts and circumstances attending the transaction in question." *Id.*

¶76 The Drews urge us to uphold the court of appeals' reversal of the district court's grant of summary judgment to Pacific. The Drews contend that RSN acted with express and implied authority from Pacific Life because the Producer's Contract authorized RSN to "solicit and procure" the purchase of Pacific's products, and describing and discussing the product or policy is a necessary and natural part of procuring or soliciting the sale. The Drews also argue that "[w]hen RSN represented to the Drews that they should purchase Pacific's policy for the purpose of selling it on the secondary market, RSN was explaining a feature in Pacific's policy," and therefore "RSN's conduct falls squarely within the express authority granted by Pacific to RSN as a soliciting agent."

¶77 We disagree with the Drews' analysis. The Producer's Contract contained a number of express limitations that barred RSN from engaging in the precise conduct for which the Drews seek to hold Pacific liable. This leads us to conclude that RSN lacked actual authority, either express or implied, to make misrepresentations. For example, it is undisputed that Pacific's policy did not meet the Drews' insurance needs, as they already had other life insurance at the time. Selling them this policy was, therefore, contrary to the prohibition in the Producer's Contract on soliciting policies that do "not meet the customer's insurance needs and financial objectives." *See supra* ¶¶ 9, 27. It is also undisputed that when the Drews purchased Pacific's policy for the primary purpose of selling it on the secondary market for a profit, Utah law prohibited issuing, soliciting, or marketing a life insurance policy or annuity for the "primary purpose of or with a primary emphasis on" selling the policy on the secondary market. *See* UTAH CODE §31A-36-111(5); *see also supra* ¶ 22 n.4. Therefore, soliciting the Drews' purchase of this policy with a purpose prohibited by law was contrary to the contractual bar on engaging in "any act prohibited under this contract . . . or by law." *See supra* ¶¶ 8, 27. Further, when RSN told the Drews that they would be able to sell the policy for a profit, that violated the Contract's prohibition on "making any promises respecting any policy." *See supra* ¶¶ 10, 27. This is enough to defeat a claim based on actual authority as a matter of law.

¶78 The Drews contend that contractual limitations cannot eliminate Pacific's liability for RSN's acts. The Drews assert that, when the Producer's Contract prohibited RSN from making misrepresentations and from selling products that did not meet the

customer's needs, "Pacific simply by contract required RSN to do a good job as a soliciting agent, namely to not commit fraud and to accurately assess the insurance needs of a customer." And, the Drews continue, these limitations cannot allow Pacific to escape liability.

¶79 There is both logic and force to that argument, but we find it misdirected as a rationale for concluding that RSN possessed *actual* authority, as opposed to apparent authority. Indeed, the Drews cite to no Utah authority, and we can find none, that establishes that an agent can have express or implied authority in the face of an uncontradicted express limitation on his or her ability to act.[14] *Cf. Zions First Nat. Bank*, 762 P.2d at 1094 (explaining that implied authority flows from "the main authority expressly delegated to the agent").

¶80 Many other courts hold that actual authority—express and implied—generally does *not* include things that are "specifically forbidden" by the principal. *See, e.g.*, *Wigfall v. City of Detroit*, 934 N.W.2d 760, 766 (Mich. 2019). Nor does it generally include actions that are "contrary to the express intentions of the principal." *See Wolverine World Wide, Inc. v. Wolverine Canada, Inc.*, 653 F. Supp. 2d 747, 763 (W.D. Mich. 2009); *see also H. Wayne Palmer & Assocs. v. Heldor Indus., Inc.*, 839 F. Supp. 770, 780 (D. Kan. 1993) ("[E]very delegation of authority, whether general or special, carries with it, *unless the contrary be expressed*, implied authority to do all of those acts, naturally and ordinarily done in such cases, which are reasonably necessary and proper to be done in order to carry into effect the main authority conferred." (emphasis added) (emphasis omitted from "implied authority") (citation omitted)); *Old Standard Life Ins. Co. in Rehab. v. Duckhunt Fam. Ltd. P'ship*, No. 2:05-CV-00536 PGC, 2006 WL 3716110, at *5–6 (D. Utah Dec. 14, 2006) (finding no express authority to do things "specifically prohibited," and no implied authority to do things contrary to the "carefully limited . . . scope" of authority); *see also* RESTATEMENT (THIRD) OF AGENCY § 2.02 cmt. e (AM. L. INST. 2006) ("[T]he principal may revoke or limit authority subsequent to granting it. An agent's understanding at the time the agent acts is controlling. If an agent knows that the principal's reason for previously authorizing the agent to do an act is

---

[14] The Drews cite many of the same sources on which the court of appeals relied. But, as we explained before, we don't find those cases terribly helpful to an understanding of the statute. *See supra* ¶¶ 64–68.

no longer operative, the agent does not have actual authority to do the act.").[15]

¶81 To be clear, the written contract between RSN and Pacific may not necessarily be the exclusive source of RSN's actual authority. "[A]uthority may be implied from the words *and conduct* of the parties *and the facts and circumstances* attending the transaction in question." *Zions First Nat. Bank*, 762 P.2d at 1095 (emphases added). Thus, RSN might have had actual authority *if* there were evidence of conduct or other statements by Pacific Life or other facts or circumstances demonstrating that Pacific Life had overridden the contractual limitations and actually authorized or ratified RSN's actions. But the Drews point to nothing other than the contract as the source of RSN's actual authority. And the contract contains many express limitations on RSN's authority, which RSN violated. Specifically, RSN lacked express and implied authority to solicit the Drews' purchase of a policy from Pacific that they did not need and could not afford, and that was for the illegal, primary purpose of selling it on the secondary market. No reasonable trier of fact could find otherwise. The district court was therefore correct in granting summary judgment to Pacific on the question of actual express and actual implied authority. To the extent any part of the court of appeals' decision to grant summary judgment to the Drews was based on a conclusion that RSN had actual authority from Pacific, we reverse and partially reinstate the district court's decision to grant summary judgment on the question of RSN's lack of express and implied authority.

*B. RSN Acted With Apparent Authority, and Partial Summary Judgment to the Drews Should Have been Granted on that Basis*

¶82 Even though RSN lacked actual authority from Pacific, it is still possible for it to have possessed apparent authority. *See Burdick*

---

[15] We note, however, that "[t]he effect of contractual language on a principal's liability for tortious misrepresentations made by an agent is determined by contract-law principles, as well as agency-law doctrines." RESTATEMENT (THIRD) OF AGENCY § 7.08 cmt. c(4). Some types of exculpatory clauses may be unenforceable as a matter of public policy. *See id.* Further, if a contractual limitation on authority were to conflict with a grant of authority, we would turn to contract principles to interpret whether the grant or the limitation wins. Because we conclude that RSN had apparent authority, we need not wrestle with these questions in this opinion.

*v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 21 n.11, 345 P.3d 531 (explaining that actual authority and apparent authority "may exist concurrently or there may be one and not the other" (citation omitted)). While actual authority "relates to a principal's manifestations to the agent," apparent authority "relates to a principal's manifestations to a third party." *Id.* ¶ 21. "[A]pparent authority when present trumps restrictions that the principal has privately imposed on the agent. . . . Apparent authority is distinct from the circumstances of an agency relationship known to agent and principal, which may not be observable by a third party . . . ." RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. c.

¶83 Apparent authority exists "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Burdick*, 2015 UT 8, ¶ 21 (quoting RESTATEMENT (THIRD) OF AGENCY § 2.03). The three elements of apparent authority recognized in Utah are:

> (1) that the principal has manifested his [or her] consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) that the third person, relying on such appearance of authority, has changed his [or her] position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

*Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 209 (Utah 1993) (alterations in original) (citation omitted); *Burdick*, 2015 UT 8, ¶ 23 (citation omitted).

¶84 The court of appeals did not address apparent authority. The Drews nevertheless urge us to find that RSN had apparent authority and to affirm the court of appeals' grant of summary judgment to them on that ground.[16] The Drews contend that "the undisputed facts support that RSN acted with apparent authority

---

[16] We may "affirm the judgment appealed from if it is sustainable on any legal ground or theory" that is both "apparent on the record" and "sustainable by the factual findings of the trial court." *State v. Topanotes*, 2003 UT 30, ¶ 9, 76 P.3d 1159 (citation omitted) (internal quotation marks omitted); *see also Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d 1158.

when it misrepresented to the Drews that they should purchase Pacific's insurance for the purpose of selling the policy on the secondary market." Pacific urges us to find that RSN lacked apparent authority on the same grounds as the district court did. Pacific asserts that "the only representation made to the Drews was Pacific Life's name on its policy application," and that it is "not clear the Drews even saw the Pacific Life name on the policy application," and even if they had, that would still be insufficient because there was no direct communication between the Drews and Pacific Life.

¶85 The district court cited the test set forth in *Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 209 (Utah 1993), and analogized to *Bodell Construction Co. v. Stewart Title Guaranty Co.*, 945 P.2d 119 (Utah Ct. App. 1997). The district court reasoned:

> Pacific Life made no manifestations to [the Drews] that the RSN Defendants had authority to make promises . . . regarding the purchase of life insurance for the purpose of selling that insurance on the secondary market or for any other alleged illegal act or omission noted in the Second Amended Complaint.

The court further reasoned that the Drews "dealt exclusively with the RSN Defendants and relied solely on their representations." The court concluded that "the RSN Defendants' use of Pacific Life's insurance application forms, without additional representations from Pacific Life to [the Drews], was insufficient to establish that the RSN Defendants were acting with apparent authority from Pacific Life." In other words, the district court determined that the first and third elements of the *Luddington* apparent authority test had not been met.

¶86 We disagree with the district court's articulation and application of the apparent authority test and conclude the district court erred in granting summary judgment to Pacific on that basis.

1. Pacific's Manifestations of Consent to RSN's Authority

¶87 We disagree with the district court's conclusion and Pacific's contention that RSN's use of Pacific's application forms cannot constitute a manifestation of consent to RSN's authority. *See supra* ¶¶ 84–85. We further disagree with Pacific's argument, and the district court's implication, that the only way for Pacific to manifest consent to RSN's authority, for the purpose of apparent authority, is through direct communication with the Drews. *See supra* ¶¶ 84–85.

¶88 First, the alleged principal need not directly interact with the plaintiff to establish apparent authority. It is correct that the first prong of apparent authority requires showing that the principal

"manifested his [or her] consent to the exercise of such authority" by the agent or apparent agent. *Luddington*, 855 P.2d at 209 (alteration in original) (citation omitted); *Burdick*, 2015 UT 8, ¶ 23. And apparent authority "flows only from the acts and conduct of the principal." *Zions First Nat. Bank*, 762 P.2d at 1095. We have also said that "one who deals exclusively with an agent has the responsibility to ascertain that agent's authority despite the agent's representations." *Id.* (citation omitted). But that does not always require a *direct* interaction between the principal and the plaintiff.

¶89 We have said multiple times that "[t]he doctrine of apparent authority has its roots in equitable estoppel," and "is founded on the idea that where one of two persons must suffer from the wrong of a third[,] the loss should fall on that one whose conduct created the circumstances which made the loss possible." *Luddington*, 855 P.2d at 209 (citations omitted); *Burdick*, 2015 UT 8, ¶ 22 (citation omitted).[17] Another justification underlying apparent authority is that of "business expediency—the desire that third persons should be given reasonable protection in dealing with agents." *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 567 (1982) (quoting RESTATEMENT (SECOND) OF AGENCY § 262, cmt. a (AM. L. INST. 1958)); *see also Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 475 (Colo. 1995) (en banc).

¶90 It benefits both the principal and the public for "persons dealing with agents [to] be able to rely upon apparently true statements by agents who are purporting to act and are apparently acting in the interests of the principal." *Am. Soc. of Mech. Eng'rs, Inc.*, 456 U.S. at 567 (quoting RESTATEMENT (SECOND) OF AGENCY § 262, cmt. a). Apparent authority "promotes business expediency and ensures the free flow of commerce" because it avoids the delay and "inconvenience" that both the principal and the third party would experience if principals had to "constantly . . . confirm the scope of their agents' authority." Steven N. Bulloch, *Fraud Liability Under Agency Principles: A New Approach*, 27 WM. & MARY L. REV. 301, 311–12 (1986). "Commerce flows much more smoothly when third parties are permitted to act upon reasonable representations made by an

---

[17] Scholars similarly reason that "[w]hen the conduct of a principal creates in a third party reasonable expectations that the agent has the authority to enter into a particular contract, the third party should be allowed to enforce that contract against the principal if it was negotiated through the agent." Steven N. Bulloch, *Fraud Liability Under Agency Principles: A New Approach*, 27 WM. & MARY L. REV. 301, 311 (1986).

agent on behalf of a principal and when third parties need not inquire into the agent's authority to make such statements." *Id.* at 314.

¶91 If we were to hold that establishing apparent authority requires persons dealing with apparent agents to contact the principal to verify the agent's authority, we would undermine the business expediency rationale behind apparent authority. Apparent authority would cease to exist as anything more than an academic idea.

¶92 Therefore, when we said that "one who deals exclusively with an agent has the responsibility to ascertain that agent's authority despite the agent's representations," *Zions First Nat. Bank*, 762 P.2d at 1095 (citation omitted), we cannot have meant that the person dealing with the agent must directly contact the principal to verify the agent's authority. Rather, we read that statement from *Zions First National Bank* as relating to the requirement that the plaintiff's belief in the agent's authority must be not only a subjective, actual belief, but must also be *objectively reasonable*. *See Burdick*, 2015 UT 8, ¶ 21 (explaining that apparent authority requires a third party to "reasonably believe[] the actor has authority to act on behalf of the principal . . . ." (quoting RESTATEMENT (THIRD) OF AGENCY § 2.03)); *see also Luddington*, 855 P.2d at 209. This reasonable belief must still be based on manifestations by the principal as to the agent's authority, and not solely the representations of the agent; but those manifestations need not be made in a direct interaction between the principal and plaintiff. *See* RESTATEMENT (THIRD) OF AGENCY § 3.03 cmt. b ("[A]n indirect route of communication between a principal and third party may suffice, especially when it is consistent with practice in the relevant industry.").

¶93 Second, applications for a principal's products and marketing materials produced by the principal may, in some instances, be indicia of authority. True, we said in *Zions First National Bank* that "[t]he furnishing of a rubber stamp bearing the name and address of the principal . . . did not cloak [the agent] with apparent authority to endorse corporate checks and receive payment for them." 762 P.2d at 1095 (third alteration in original) (quoting *Pargas, Inc. v. Taylor's Est.*, 416 So. 2d 1358, 1362 (La. Ct. App. 1982)). And the court of appeals quoted that statement in *Bodell*, 945 P.2d at 124. But the district court here misconstrued the full context of those quotes.

¶94 We borrowed the quoted language from a Louisiana case: *Pargas, Inc. v. Taylor's Estate*, 416 So. 2d 1358, 1362 (La. Ct. App. 1982). It is unclear whether, in *Pargas*, the principal had given its

employee-agent the rubber stamp bearing the principal's signature, or whether the agent had created or used the stamp on his own. Further, the Louisiana Court of Appeals also rested its conclusion on the fact that it was "not reasonable under the circumstances presented" for the plaintiff to rely on the agent's authority "to apply corporate checks to his personal benefit." *Id.* Nor would it be reasonable, the court explained, to rely on the agent's employment status as an indicia of authority to endorse checks for the principal because "[i]f mere employment furnished apparent authority to endorse checks[,] no business would be safe." *Id.* Given everything else that was going on in *Pargas*, we are not convinced the *Pargas* court declared a rule that a rubber stamp bearing the employer's name could *never* be an indicia of authority. And we are certainly not convinced that we intended to rubber stamp any such conclusion.

¶95  In *Zions First National Bank*, the bank attempted to bind the defendant company to a promissory note that had been executed by one of the defendant's employees using "facsimile signature stamps of [the defendant's] officers." 762 P.2d at 1092. We held that the district court had inappropriately granted summary judgment to Zions Bank on the question of apparent authority. *Id.* at 1095–96. As in *Pargas*, it is unclear whether the agent in *Zions* created the signature stamps on his own or whether the bank had given them to the agent to use. *See id.* Further, the bank's vice president had admitted under oath that the bank did "not know of any specific authorization for Zions First National Bank to accept stamped signatures on [the] defendant's checks." *Id.* at 1095. Moreover, the company indicated that its employee was "never authorized to sign promissory notes." *Id.* These facts suggest a genuine issue of material fact on whether it was reasonable for the bank to accept stamped signatures as an authorization for the defendant, when there was no record of that being an established or accepted practice for that client or for the industry. We are therefore unconvinced that *Zions* created an unbending rule that signature stamps can *never* constitute an indicia or manifestation of apparent authority.

¶96  Finally, the district court relied on *Bodell Construction Co. v. Stewart Title Guaranty Co.*, 945 P.2d 119 (Utah Ct. App. 1997). There, the court of appeals held that a title insurance agent's use of a title insurer's name on letterhead, title policies, and settlement statements was insufficient to establish that the agent had apparent authority to act as the title insurer's agent in escrow, settlement, and closing transactions. *Id.* at 124. But the district court missed the full context. First, it appears that the agent created its own letterhead and placed the title insurer's name on it and other documents on its own. *See id.* at 122 ("First Title used Stewart Title's name on its settlement

statements and also its letterhead."); *id.* at 124 ("Any appearance of authority to act as Stewart Title's agent in escrow, closing, or settlement transactions came from First Title, not Stewart Title."). Further, the dispute was about whether the agent had authority to conduct certain actions that differed in kind from the principal's primary business. That is, whether the alleged agent had authority to conduct escrow, settlement, and closing transactions for a title insurance company. *See id.* Those facts speak to the question of whether it was reasonable for the plaintiff to believe the alleged agent had such out-of-the ordinary authority, not necessarily whether there were any indicia of authority in the first instance.

¶97 Similarly, when we said in *Burdick* that a business card bearing the name of the defendant was, "alone . . . not sufficient to constitute a manifestation of authority" by the defendant, it again is unclear whether the alleged agent manufactured the business card on his own or whether the defendant had given him the card. *See Burdick*, 2015 UT 8, ¶¶ 37–39. Further, the court's ultimate conclusion there—that the agent lacked apparent authority—turned on the totality of the circumstances indicating an absence of indicia of authority. The court reasoned that, for one of the plaintiffs relying on the business card as indicia of agency, that plaintiff also "did not open a regular account with [the principal], [he] did not send [his] checks to the brokerage, and [he] never received a single receipt, statement, or other communication bearing [the principal]'s name." *Id.* ¶ 39 (alterations in original) (citation omitted). That again appears to speak to the reasonableness of the reliance on the business card, and not a statement that materials from the principal cannot serve as indicia of authority to act on the principal's behalf.

¶98 Further, the facts of this case are different from those on which the district court relied. Unlike in *Zions* and the other cases discussed above, the undisputed record here establishes that Pacific provided RSN with insurance forms for use in selling its products, and RSN provided those forms to the Drews. *See supra* ¶ 16. Nothing indicates that RSN manufactured those application forms on its own to create the appearance that it was working for Pacific. Therefore, even though the Drews did not speak directly with Pacific, *see supra* ¶ 16, Pacific's act of giving its policy application forms to RSN could constitute a manifestation of consent to RSN's authority to solicit applications for Pacific's policies and provide information about them. *See* RESTATEMENT (THIRD) OF AGENCY § 3.03 cmt. b ("[A]n indirect route of communication between a principal and third party may suffice, especially when it is consistent with practice in the relevant industry.").

¶99 Moreover, even if application forms were insufficient at common law to constitute an appearance of authority, the statute at the heart of the Drews' liability theory says otherwise:

> There is a rebuttable presumption that every insurer is bound by any act of its appointed licensee performed in this state that is within the scope of the appointed licensee's actual (express or implied) or apparent authority, until the insurer has canceled the appointed licensee's appointment and has made reasonable efforts to recover from the appointed licensee its *policy forms and other indicia of agency*.

UTAH CODE § 31A-23a-405(2) (emphasis added). In other words, "policy forms" given by an insurer to its appointed licensee are "indicia of agency" under the statute. We must, therefore, conclude that the forms Pacific gave RSN may constitute a manifestation of consent to RSN's authority to procure or solicit applications for Pacific's policies.

¶100 The district court therefore erred in granting summary judgment to Pacific on the ground that the forms could not, as a matter of law, manifest an appearance of authority. The question then becomes what the Drews actually saw, knew, and reasonably believed about RSN's authority to act on behalf of Pacific Life.

2. The Drews' Knowledge of the Relevant Facts and Reasonable Belief in RSN's Authority

¶101 The second element of apparent authority requires that the person relying on the authority "knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority." *Luddington*, 855 P.2d at 209 (citation omitted); *Burdick*, 2015 UT 8, ¶ 23 (citation omitted). In other words, the person must have actually known of the relevant facts establishing the principal's manifestation of consent to the alleged agent's authority and, based on that knowledge, the person must have actually, subjectively believed *and* objectively, reasonably believed in that authority. *Burdick*, 2015 UT 8, ¶ 21.

¶102 To establish this second element of apparent authority, the Drews primarily rest on their assertion that they "believed that RSN was the agent of Pacific because RSN had the forms and other information necessary to sell Pacific's products."[18] Pacific questions

---

[18] The Drews also contend that Pacific manifested consent to RSN's authority because it "contracted with RSN and gave notice to

(continued . . .)

the Drews' actual knowledge of the relevant facts, asserting that it is "not clear the Drews even saw the Pacific Life name on the policy application." Pacific also avers that "Mr. Drew signed the application without reading any of its contents because [RSN] represented that [it] would fill out the rest."

¶103 The Drews admit that they signed the insurance forms with many details blank after RSN assured them that RSN would fill in the details later. *Supra* ¶ 17. Mr. Drew also testified that "we didn't read most of the things" RSN provided. *Supra* ¶ 17. Pacific pointed to these pieces of testimony in their memorandum supporting their summary judgment motion at the district court. And they repeated those citations in their briefing to the court of appeals and to us.

¶104 But even if the Drews signed Pacific's forms with details left to be inserted, that would not negate the fact that Pacific's name was on their form. Nor does the Drews' failure to read *most* things necessarily mean that the Drews did not see Pacific's name on the application forms. To the contrary, Mr. Drew testified that he "felt" that RSN "represented Pacific Life and had the authority to do whatever it curtailed to sign" the forms, not only because RSN "told us that [they] represented each" insurance company,[19] but also

---

the world through public filings that RSN was its agent." We agree with the Drews that Pacific's act of appointing RSN as its licensee and making public filings with the state insurance commissioner *could* constitute a manifestation of consent to RSN's authority under the first element of apparent authority. But we also agree with Pacific that those public filings, as well as the Producer's Contract, are only relevant to apparent authority if the Drews actually knew of those filings, the appointment, or the Producer's Contract. Under the second element of apparent authority, notice to the world at-large—without notice to the Drews—is insufficient. *See Luddington*, 855 P.2d at 209 (requiring the injured party to establish that they "knew of the facts" (citation omitted)). The Drews do not provide us with any record evidence that supports the conclusion that they actually knew of Pacific's public filings or appointment of RSN as its licensee. We therefore do not further consider this reference to Pacific's public filings as a potential basis for concluding that RSN acted with apparent authority.

[19] Mr. Drew also testified that he believed RSN represented multiple insurance companies and "represented the company that he was talking about insuring with me." *Supra* ¶ 18. To the extent the

(continued . . .)

because RSN "gave me all the information." *Supra* ¶ 18. Mr. Drew explained that his basis for believing that RSN was "representing" Pacific was "the same" as for his belief that RSN also represented another company, Phoenix, because RSN had given him "information and the forms and so forth that we went through." *Supra* ¶ 18. Similarly, when Mrs. Drew was asked if RSN ever told her that RSN "worked for Pacific Life," she responded, "Well, [RSN] was selling your product and so it was on your papers." *Supra* ¶ 19. Mrs. Drew reiterated that she believed RSN was an "agent" of Pacific Life and other companies because RSN "had papers from" Pacific Life and other companies. *Supra* ¶ 19. The Drews cited these portions of their depositions in their memoranda supporting their motion for summary judgment. And they repeated this argument in their briefing to the court of appeals and to us.

¶105   The district court did not address the knowledge element of apparent authority in its summary judgment decision. However, both parties cited the evidence on this point to the district court. We conclude that the evidence in front of the district court on summary judgment establishes that the Drews knew that they were signing Pacific Life forms and, based on that, they actually believed RSN had authority from Pacific to make representations about Pacific's products. That is sufficient to establish the Drews' actual knowledge of the facts relevant to Pacific's manifestation of RSN's authority, and to establish the Drews' subjective belief therein. The only piece of contrary evidence that Pacific Life used to argue against the grant of summary judgment—that the Drews failed to read other details on the forms—does not create a genuine dispute of material fact as to the relevant question: whether the Drews saw Pacific's name on the forms and, based on that, developed a belief about RSN's authority.

¶106   The Drews' belief is also objectively reasonable to the extent they believed that "RSN acted with apparent authority when it misrepresented to the Drews that they should purchase Pacific's insurance for the purpose of selling the policy on the secondary market." A reasonable person of ordinary prudence could assume

---

Drews' belief in Pacific's authority was based on representations of authority made by RSN, that is insufficient to establish apparent authority. Apparent authority "flows only from the acts and conduct of the principal." *Zions First Nat. Bank*, 762 P.2d at 1095. But, as discussed above and in this section, apparent authority *may* flow from Pacific's act of giving RSN its policy application forms for use in soliciting applications.

that if a salesperson has authority to solicit and submit application forms for a company's products, then the salesperson also has authority to describe features, uses, and advantages and disadvantages of the product. Otherwise, the salesperson would be nothing more than a vessel for carrying forms. No reasonable juror could conclude otherwise in the absence of additional facts that are not present here. *See* RESTATEMENT (THIRD) OF AGENCY § 3.03 cmt. b ("A principal may also make a manifestation by . . . placing an agent in charge of a transaction or situation. Third parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting that this may not be so. A principal may make an additional manifestation by permitting or requiring the agent to serve as the third party's exclusive channel of communication to the principal."). Pacific Life has pointed to nothing in the record that would create a genuine issue of material fact on the question of the reasonability of the Drews' belief that RSN had authority to make representations about Pacific Life's products.

3. The Drews' Change in Position Based on Their Reliance on RSN's Appearance of Authority

¶107 The third and final element of apparent authority is that the plaintiff, "relying on such appearance of authority, has changed his [or her] position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal." *Luddington*, 855 P.2d at 209 (alteration in original) (citation omitted). "[A] plaintiff must establish that he relied on the manifestation of authority—that is, that he changed his position as a result of the appearance of authority." *Burdick*, 2015 UT 8, ¶ 27.[20]

¶108 At the district court, the Drews asserted in their summary judgment memorandum that "Pacific's conduct caused the Drews to have the belief that . . . RSN w[as] authorized to represent Pacific," and that the Drews "suffered significant losses as a result of RSN's misconduct." The Drews also explained that they chose to purchase a $1.5 million policy from Pacific Life not because they needed or wanted life insurance, but solely because of the "representations from RSN about profiting from selling insurance policies on the

---

[20] We note that this differs from the Restatement (Third) of Agency, which does not require reliance to establish apparent authority. We considered and rejected that specific piece of the Restatement in *Burdick*, 2015 UT 8, ¶ 27.

secondary market," citing the multiple times Mr. Drew repeated this assertion in his deposition. Pacific did not materially dispute that assertion.[21]

¶109 In their briefing to the court of appeals, the Drews more expressly connected the dots by asserting that, "[i]n reliance on Pacific's manifestation of RSN's authority, the Drews entered into an insurance contract with Pacific and paid Pacific large sums of money." In their briefing to us, the Drews argue that they believed RSN had apparent authority to advise the Drews to "purchase Pacific's insurance for the purpose of selling the policy on the secondary market." *See supra* ¶¶ 102–06. The Drews further assert, and Pacific agrees, that they submitted an application to purchase life insurance from Pacific "[b]ased upon the representations from RSN about profiting from selling the policy on the secondary market," and that they subsequently purchased a $1.5 million policy from Pacific.

¶110 Pacific did not squarely address the reliance element of apparent authority in their summary judgment memoranda. The closest Pacific came was its statements that Mr. Drew had testified that "he did not care who issued the policy. He simply followed [RSN's] recommendations," and that Mr. Drew "bought the insurance not for the insurance fact itself, but as to what [RSN] suggested that [they] do and that [they] would be able to make some additional monies," and that it "wasn't the insurance per se" that the Drews cared about, "it was what it would sell for." Pacific repeated this statement to the court of appeals. Pacific's briefing to us appears not to address the reliance and injury element of apparent authority at all.

¶111 The district court addressed this element only tangentially. The court concluded that the Drews "dealt exclusively with the RSN

---

[21] Pacific responded that the Drews' deposition testimony mentioned representations made by an RSN employee, not RSN. But Pacific did not dispute the Drews' assertion that they purchased the Pacific policy based on representations about selling the policy on the secondary market. And Pacific does not argue to us that the acts of RSN's employees should not be attributed to RSN. We therefore consider the relevant point—that the Drews purchased the Pacific Life policy based on their belief in and reliance upon RSN's representations about the opportunity to profit from selling the policy on the secondary market and that the Drews believed RSN had authority to make such representations—to be undisputed.

Defendants and relied solely on their representations," and "did not rely on any representation from Pacific Life as to the authority of the RSN Defendants to act on behalf of Pacific Life." But this speaks more to the question of whether Pacific made any manifestations of consent to RSN's authority. *See supra* ¶¶ 87–100. It does not really counter the argument that the Drews changed position as a result of their reliance on the statements RSN made with the appearance of authority.

¶112 In other words, the Drews placed evidence before the district court demonstrating that they believed RSN had authority from Pacific to make representations about Pacific's products. They pointed to evidence in the record that showed they reasonably believed that Pacific Life had authorized RSN to act in its name because RSN had Pacific's forms. The Drews also placed evidence before the court that they relied on RSN's appearance of authority and its representations about Pacific Life's products when they decided to purchase a policy with sizable premiums. At no time has Pacific Life pointed to anything in the record that would create a genuine issue of material fact on that question.[22] As a result, the Drews were entitled to summary judgment on the question of whether RSN acted with apparent authority from Pacific Life when it made representations about buying and reselling Pacific's products—it did. And the Drews are entitled to summary judgment on the question of whether they are entitled to the benefit of the

---

[22] But we note that the question of whether the Drews reasonably relied on *RSN's appearance of authority* to make representations about Pacific's products for the purpose of establishing apparent authority is different than the question—one not before this court—of whether the Drews justifiably relied on *the substance of RSN's representations* (that they could sell the policies on the secondary market for a sizeable profit) for the purpose of establishing the underlying substantive claim of fraudulent misrepresentation. *See* RESTATEMENT (SECOND) OF TORTS § 525 (AM. L. INST. 1977) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his *justifiable reliance upon the misrepresentation*." (emphasis added)). Our opinion does not speak to that second question.

rebuttable presumption that Pacific Life is bound by RSN's actions—they are.[23]

## CONCLUSION

¶113 We vacate the court of appeals' determination that RSN was an "agent" of Pacific Life based on Utah Code section 31A-1-301(88)(b) (2010). *See Drew v. Pac. Life Ins. Co.*, 2019 UT App 125, ¶¶ 12–13, 447 P.3d 1257. The Drews' theory of insurer liability is premised on Utah Code section 31A-23a-405(2). To assess whether

---

[23] At oral argument before us, Pacific Life argued that it cannot be held liable for RSN's actions under Utah Code section 31A-23a-405(2) because RSN began having conversations with the Drews about buying life insurance policies to sell on the secondary market before Pacific Life appointed RSN as its licensee. While this argument resembles an argument Pacific made to district court, *see supra* ¶ 25, Pacific did not raise this argument in their briefing to us. Although the background section of Pacific's brief outlined the chronology, Pacific did not develop a legal argument based on that timeline. In other words, Pacific Life offered no argument in its appellate briefs that section 405(2)'s rebuttable presumption would not bind an insurer where the scheme to defraud began prior to the appointment of a licensee, but continued and culminated after appointment. We offer no opinion on that question because Pacific waived the argument by not raising it on appeal until oral argument. *See State v. Johnson*, 2017 UT 76, ¶ 16, 416 P.3d 443.

Pacific Life is presumed to be bound by RSN's actions under that statute, a court must examine whether RSN was Pacific's "appointed licensee" and, if so, whether RSN acted within its "actual (express or implied) or apparent authority." We hold that RSN was Pacific's "appointed licensee." And we hold that, although RSN lacked actual authority, either express or implied, from Pacific, RSN acted with apparent authority when it made representations about Pacific's products in an effort to sell a policy to the Drews.

¶114   Because there are no genuine issues of material fact that would prevent the entry of partial summary judgment on the issue of RSN's apparent authority from Pacific Life, we remand with instructions to the district court to enter partial summary judgment to the Drews on that issue.

———————————

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶115   This is an important case raising significant questions under our law of vicarious liability in tort. Such questions generally are governed by our common-law cases. As pleaded by the plaintiffs and argued by the parties, however, these issues come to us under a statute—Utah Code section 31A-23a-405.

¶116   It is by no means clear, however, that the cited statute has any application to this case. The statute may have nothing to do with an insurer's vicarious liability in *tort*. It may speak only to whether an insurer is *contractually* "bound" to provide insurance coverage for a given "loss" or "risk." *See* UTAH CODE § 31A-23a-405(1)–(3) (using these terms).

¶117   That seems implied by the statute's focus on what an insurer is "bound by"—and its lack of any reference to the tort notion of "liability." *See id.* And it seems reinforced by the specific remedy provided in the event that a "licensee" with "authority to bind more than one insurer on a particular risk agrees to bind coverage on a particular risk, but fails to outwardly indicate" where "the risk is placed," and "a loss occurs" "before the risk is placed with a particular insurer": the "court may equitably apportion the loss among all insurers with which the licensee had binding authority as to the particular type of risk." *Id.* § 31A-23a-405(3).

¶118   No party has questioned whether this statute's terms apply to the vicarious liability issues presented for our review. "And the court lacks the power to second-guess the pleading decisions of the parties—to search the record for claims that were not pleaded by the parties but that we might prefer to resolve." *Utah Stream Access*

*Coal. v. VR Acquisitions, LLC*, 2019 UT 7, ¶ 42, 439 P.3d 593 (citation omitted) (internal quotation marks omitted).

¶119   That said, the Drews have pleaded and presented a claim for vicarious liability in tort. And it is the court's "province and duty" to "get the law right" in our disposition of that claim, "even if in so doing we establish a standard that differs from either of the approaches presented in the briefing on appeal." *McDonald v. Fid. & Deposit Co. of Md.*, 2020 UT 11, ¶ 33, 462 P.3d 343.

¶120   I see substantial room to doubt whether the vicarious liability issues presented in this case are controlled by the cited statute. With that in mind, I would ask the parties to address that question on supplemental briefing. *See State v. Johnson*, 2017 UT 76, ¶ 45, 416 P.3d 443 (stating that "an appellate court should typically allow some form of argument from the parties," as under a supplemental briefing order, before resolving  an issue on a standard "of the court's own invention"). And if we decided that the Drews' claims are governed by the common law, I would remand the case to the district court for further proceedings consistent with our opinion. *See id.* (noting that remand may be an effective means of preserving fairness to the parties, "particularly when further factual determinations are necessary").

────────────